UNITED STATES of America, Plaintiff,

v.

George PENTON, Mrs. Samuella P. Willis, Registrars of Voters of Montgomery County, Alabama, and State of Alabama, Defendants.

Civ. A. No. 1741-N.

United States District Court
M. D. Alabama, N. D.
Nov. 20, 1962.

John Doar, David L. Norman and Arvid A. Sather, Dept. of Justice, Washington, D. C., for plaintiff.

William F. Thetford, Sol., Fifteenth Judicial Circuit, Montgomery, Ala., and Maury D. Smith and James J. Carter, Montgomery, Alabama, for the members of the Board of Registrars of Montgomery County, Alabama; and MacDonald Gallion, Atty. Gen., Willard W. Livingston, Leslie Hall, Gordon Madison, John Tyson, III, Asst. Attys. Gen., Montgomery, Ala., for defendant State of Alabama.

JOHNSON, District Judge.

This action was instituted on August 3, 1961, by the Attorney General in the name of the United States pursuant to the provisions of Part IV of the Civil Rights Act of 1957 (42 U.S.C.A. § 1971, 71 Stat. 637), as amended by the Civil Rights Act of 1960 (74 Stat. 90). The State of Alabama is joined as a party defendant pursuant to § 601(b) of the Civil Rights Act of 1960; the individual defendants are joined as members of the Board of Registrars of Montgomery County, Alabama. The plaintiff seeks to have this Court grant injunctive relief against certain acts and practices that have since January 1, 1956, deprived citizens of the United States residing in Montgomery County, Alabama, of the right to register to vote without discrimination because of race or color. The plaintiff seeks to have this Court issue such additional orders as will insure the fair, equal and nondiscriminatory administration of voting registration procedures and standards in Montgomery County, Alabama.

The cause was submitted to the Court, sitting without a jury, on the issues made up by the pleadings and proof. Upon consideration of the credible evidence [1] (consisting of the oral testimony of over 175 witnesses, together with approximately 13,000 exhibits), the stipulations of the parties, the several interrogatories and responses thereto, and the briefs and arguments, this Court now proceeds to make and enter the appropriate findings of fact and conclusions of law, and, as authorized by Rule 52, Federal Rules of Civil Procedure, incorporates those findings and conclusions in this memorandum opinion.

[1] This Court finds it necessary to reject the oral testimony, in whole or in part, of some of the witnesses, their testimony being in direct conflict and unreconcilable with the truth of the matters concerned —this truth being reflected by the real evidence and the preponderance of the oral evidence from the credible witnesses.

The right to vote in Alabama is governed by both constitutional and statutory provisions.[2] This litigation does not involve the constitutionality of any of those laws.

Under the Constitution of Alabama, § 178, registration is a prerequisite to voting in any election. The registration of voters is to be conducted in each county, separately, by a board of registrars appointed by the Governor, Auditor, and Commissioner of Agriculture and Industries. Title 17, § 21, Code of Alabama 1940, Recompiled. Section 21 of the same title states that each board is to have three members, and § 34 authorizes the functions to be carried out by a majority. In addition to qualifications such as citizenship, age and residence, applicants for registration must be able to read and write, must be of good character, and must embrace the "duties and obligations of citizenship." Title 17, § 32.

A registration questionnaire is authorized by statute, the purpose of the questionnaire being to aid the registrars in determining whether the applicant possesses the requisite qualifications. The questionnaire is to be filled out "in the presence of the board without assistance" (Title 17, § 31), and is to be subscribed by the applicant (§ 186, Constitution of Alabama). The oath to support and defend the Constitution of the United States and the Constitution of the State of Alabama is to be a part of the questionnaire, with the Code providing:

> "The * * * oath shall be duly signed and sworn to by the applicant *before a member of the board.*" (Emphasis supplied.) Title 17, § 31, Code of Alabama.

The questionnaire is prescribed by the Supreme Court of Alabama and was used without any variation for practically all the period involved in this case.[3]

In May 1960, the United States filed a "records examination" demand pursuant to Title III of the Civil Rights Act of 1960. This demand was predicated upon the allegation that the Attorney General of the United States had information tending to show discrimination on the basis of race or color which had been made with respect to registration and voting in Montgomery County, Alabama. This Court ordered a production and examination of these registration records in August 1960. This production was over the objections of the defendants. See State of Alabama, etc. v. William P. Rogers, etc. et al., and In re Crum Dinkins (consolidated), 187 F. Supp. 848 (M.D.Ala., 1960); affirmed, 5th Cir., 1961, 285 F.2d 430. On June 16, 1961, the Attorney General of the United States notified the defendants of specific charges of racial discrimination in the voter registration practices in Montgomery County, Alabama. On August 3, 1961, this case was filed.

Montgomery County, Alabama, has a voting-age population of 95,967, of which 62,911 are white persons and 33,056 are Negroes. As of December 15, 1961, 33,846 white persons and 3,766 Negroes were registered to vote. From January 1, 1956 until June 16, 1961, approximately 13,390 applications for registration were filed with the Montgomery County Board of Registrars, of which approximately 8,868 were by white persons and 4,522 were by Negroes. The defendants registered over 96 per cent of the white applicants and rejected for registration over 75 per cent of the Negro applicants—including 710 Negro applicants who had 12 years or more of formal education. Of these rejected Negroes, 6 had master's de-

---

2. The provisions of Alabama law pertinent to this litigation are set out in Appendix A to this opinion.

3. A copy of this questionnaire is attached to this opinion as Appendix B. A revision of this questionnaire was made in 1960; the revised form, however, is identical with the original except the order of the questions is changed.

grees; 152 had four years of college training, and 222 had some college education. This group of rejected Negroes included 108 Negro public school teachers.[4]

Although the Montgomery County Board of Registrars had a long-established rule that the questionnaire was to be filled out completely and without assistance, this rule was not uniformly followed by the Board during the period January 1, 1956 through November 14, 1961, according to the sworn testimony of one of the registrars, Mrs. Samuella P. Willis. For instance, the Board filled out Question 5 completely for white applicants, but not for Negroes. There were other admitted exceptions, such as Questions 1 and 3 on the Supplemental Oath, the Application on page one, and Question 19. Commencing in February 1961 (after the production and examination of the records), the Board raised the standard to require a perfect application.[5]

The evidence in this case (particularly the originals of the questionnaires themselves) overwhelmingly reflects that from January 1, 1956 until at least June 1960, the registrars of Montgomery County, Alabama, and the defendant State and its agents, have deliberately and consistently engaged in procedures and practices which have favored white applicants and discriminated against Negro applicants who were seeking to become registered voters. This discrimination was in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States and the Civil Rights Act, supra, in that it involved procedures and practices designed to deny (and which were effective in denying) the rights of citizens to vote without distinction of race or color. United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524; United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535; and United States v. State of Alabama, 192

4. A year-by-year statistical breakdown is as follows:

ACCEPTED AND REJECTED APPLICATIONS
OF WHITE AND NEGRO APPLICANTS
January 1, 1956, through May, 1961

| | | Total Applied | | Accepted | | Rejected | | Per Cent Rejected | |
|---|---|---|---|---|---|---|---|---|---|
| | | W | N | W | N | W | N | W | N |
| Jan. 1, 1956, through | W | 1169 | | 1137 | | 32 | | 2.6 | |
| May, 1956 | N | | 328 | | 90 | | 238 | | 72.6 |
| June, 1956, through | W | 1255 | | 1237 | | 18 | | 1.4 | |
| May, 1957 | N | | 751 | | 200 | | 551 | | 73.4 |
| June, 1957, through | W | 2159 | | 2137 | | 22 | | 1.0 | |
| May, 1958 | N | | 977 | | 185 | | 792 | | 81.0 |
| June, 1958, through | W | 1533 | | 1482 | | 51 | | 3.3 | |
| May, 1959 | N | | 892 | | 189 | | 703 | | 78.8 |
| June, 1959, through | W | 1352 | | 1293 | | 59 | | 4.4 | |
| June 24, 1960 | N | | 907 | | 225 | | 682 | | 75.2 |
| June 25, 1960 through | W | 1400 | | 1282 | | 118 | | 8.4 | |
| June 16, 1961 | N | | 667 | | 225 | | 442 | | 66.3 |
| TOTAL ........ | W | 8868 | | 8568 | | 300 | | 3.4 | |
| | N | | 4522 | | 1114 | | 3408 | | 75.4 |

5. A transcript of a portion of Mrs. Willis's testimony which relates to this point and as given on January 9, 1962, is attached hereto as Appendix C.

F.Supp. 677 (M.D.Ala., 1961), 304 F.2d 583 (5th Cir., 1962); affirmed by the Supreme Court of the United States, 83 S.Ct. 145 (1962).

As to Negro applicants, the defendants used the questionnaire to obtain substantive information regarding the applicants' qualifications for registering *and also* as a tricky examination or test. If a Negro applicant failed to meet the standard required of him, he was denied registration regardless of whether the error or omission on the form was formal, technical, or inconsequential. With respect to white applicants, the defendants used the questionnaire merely as a method to obtain substantive information concerning the applicants' qualifications. For white applicants, the questionnaire was not used as an examination or test.[6]

Prior to June 1, 1960, the Board registered only 54 Negro applicants who had technical errors appearing in their questionnaires; up until the same time, the Board rejected only 74 whites for the same type errors. The rejection of whites subsequent to June 1960 (and particularly since June 1961, when it became apparent that this case was to be filed)[7] impresses this Court as being nothing more than a sham and an attempt on the part of the Board to disguise their past discriminatory practices. The rejection of these white applicants approached the ridiculous when the Board rejected the law partner of one of the defense attorneys, a retired general and graduate of West Point, and the college graduate son of one of the

State's attorneys general. Such evidence has little or no probative value.

This Court has made a careful study and analysis of both the white accepted and Negro rejected applicants whose applications were processed by the Board during the period involved in this case. One thousand and seventy white applicants whose applications contained technical errors were accepted by the Board during the period January 1, 1956 to June 14, 1961. This is in startling contrast to the Board's grading of the Negro applicants' questionnaires. This discrimination in grading was further aggravated by the defendants' assisting, when necessary, white applicants in completing the application form by explaining questions on the form and the answers required, or filling out part of the form for white applicants.[8] Such discriminatory practices are further reflected by the undisputed testimony (and sharply reflected by the original questionnaires) that the Board in most instances completed the difficult question (number 5) for white applicants, but failed to give this assistance to Negro applicants.

In 1958 the defendants adopted a policy of rejecting all applicants who failed to sign the oath on page three of the application form. During the period from January 1958 to June 1960, the defendants have disapproved approximately 600 applications of Negro applicants who failed to sign the oath, although the oath was administered to them orally. In these instances, even though the oath was to be signed in the

6. An examination of Appendix B will show that the questionnaire contains 21 questions and statements, some of which require a response to a specific question and some require the filling in of blanks within the question itself. There are at least four questions which require multiple answers, but are in no way subdivided into parts. There are nine places where the name of the applicant is to be filled in —one of which is "hidden" (Question 3). Certain questions are phrased in legalistic terms (Question 5 which was filled in for whites by the Board), and others (such

as Question 19) are grammatically confusing.

7. Practically all the defendants' white witnesses (also 14 applications of white applicants not testifying) who were rejected by the Board were rejected after June 1960. Thirty-one out of 34 of these applications were after June 1, 1960.

8. Instances of such practice are set out in the form of verbatim testimony of white witnesses. See Appendix D.

official's presence, the registrar would permit the Negro applicants to walk from the office without calling the omission to their attention. Such a practice on the part of the registrars evidences bad faith; it leads to the inevitable conclusion that such a device was used by them for deception. Wholesale discrimination resulted by the contrasting practice of the registrars in handling the "oath" part of the questionnaire for white applicants. The several thousand applications (particularly the originals) on file as exhibits in this case reflect X's, check marks, dashes and dots on literally hundreds of applications of whites at the "oath" place on the application form. This Court would be naive to the point of absurdity if this evidence (such as the marks themselves, the contrasting shades of ink used in making them, the places where they occur, the fact that no marks appear on applications of Negroes, and the oral testimony concerning the marks) did not compel the conclusion that they were made by the registrars and made for the purpose of showing the white applicants where to sign.

The only witness offered by the defendants in an attempt to explain these marks was a clerk in the office of the Judge of Probate. Her explanation—which is totally inadequate—was that some marks were placed on the applications when they were processed by the office of the Judge of Probate. The marks which this witness demonstrated that she used are totally different from those made to indicate where the oath should be signed. This is aside from the fact that applications of Negroes were processed by the same office and no such marks appear on any of them— only on applications of whites.

During the entire period involved in this case, the Montgomery County Board of Registrars followed the practice of not notifying the rejected applicants as to the action of the Board. Such a failure to notify the persons denied left such persons in a position of not knowing when their thirty-day period to appeal (§ 35, Title 17, Code of Alabama 1940, Recompiled) had commenced to run.

■ Under the Civil Rights Act of 1957, as amended in 1960, supra, where a finding of discrimination—such as the evidence in this case compels—has been made and such discrimination results in a deprivation of voting rights pursuant to a pattern and practice, the Negro applicants who have thus been deprived of their right to vote may apply to the federal court to be registered. In determining whether such applicants are qualified the Court must apply the same standards used by the Board of Registrars in qualifying white applicants during the period within which the pattern of discrimination is found to exist. Accordingly, it is necessary in this case to determine what those standards were.

The evidence in this case shows that during the period involved in this case the qualifications used by the Montgomery County Board of Registrars in registering white persons were:

1. That the applicant be a citizen and be over 21 years of age.

2. That the applicant reside in the State two years, in the county one year, and in the precinct three months.

3. That the applicant be able to read and write by filling in the application form such as has been designated herein as Appendix B to this opinion.

4. That the applicant embrace the duties and obligations of citizenship and demonstrate his willingness to sign the oath and answer the questions on the form relating to loyalty.

5. That the applicant be not possessed of some disqualification by reason of bad character, a conviction of a disqualifying crime, insanity or idiocy.

■ The evidence offered on the trial of this case, including an examination and study of each of the questionnaires

filed by the rejected Negroes and an application of the above-enumerated standards, compels a specific finding by this Court that certain Negro applicants were denied registration solely on account of their race or color, and, further, that each was at the time of his application qualified to register to vote under the Alabama law and under the practice and procedures followed by the Board of Registrars of Montgomery County as to white applicants. Therefore, this Court now specifically finds that each of the Negro applicants listed in Appendix E, attached hereto, was so qualified at the time of the filing of his application and that each such applicant is to be registered unless he has been subsequently registered, has become deceased, or possessed with some disqualification to register to vote since the date of his application.

In the future, in order to apply these standards consistent with past practices and without discrimination, the Montgomery County Board of Registrars and the defendant State of Alabama must observe the following procedures and rules:

1. If the applicant has not been convicted of a felony, a crime involving moral turpitude or a disqualifying crime as defined by the Alabama Constitution, and if he is neither a dope addict nor a habitual drunkard, he shall be deemed to be of good moral character.

2. The Board shall orally determine whether the applicant meets the residence requirements. If the Board is satisfied as to the applicant's residence, it shall fill in Question 5 (the question dealing with length of residence in the State, county and precinct) for the applicant, as it did before 1960 for white applicants.

3. An applicant may not be rejected on the ground that he has failed to sign the Oath, the Supplemental Oath, or the spaces for the applicant's name in the Supplemental Application. The registrars are under a duty to have the applicant sign in the appropriate places unless he refuses to do so.

4. An applicant may not be rejected or denied for technical or inconsequential errors or omissions made by him in filling out the application. Such errors and omissions were not used as a basis for rejecting the applications of white applicants prior to June 1960.

5. An applicant whose application is rejected or denied must be notified of that fact within ten days from the date of his application. The notice must contain the specific reasons for the rejection or denial.

■ This Court must conclude, as a matter of law, that the foregoing acts and practices on the part of the defendant registrars were in violation of 42 U.S.C.A. § 1971(a) and were the acts and practices of the defendant State of Alabama under the Civil Rights Act of 1960, § 601(b).

■ This Court further concludes that the several discriminatory acts and practices as herein set forth constituted deprivations of rights secured by the Fourteenth and Fifteenth Amendments to the Constitution of the United States and by Title 42 U.S.C.A. § 1971(a), namely, the right to register to vote and to vote without distinction of race or color. These deprivations have been and are pursuant to a pattern and practice of racial discrimination within the meaning of Title 42 U.S.C.A. § 1971(e).

■ Under 42 U.S.C.A. § 1971(d) and because of the circumstances reflected by the evidence in this case, this Court now concludes that it is necessary and proper to order the Board of Registrars of Montgomery County, Alabama, and the defendant State of Alabama, its officers and employees, to register those

Negro applicants who were possessed of all the qualifications and none of the disqualifications to register to vote at the time they applied for and were deprived registration by the defendants. Those Negro citizens of Montgomery County listed in Appendix E, attached hereto, were so qualified by law to be registered to vote. The denial of such citizens by the defendants was and is in violation of 42 U.S.C.A. § 1971(a) and is therefore null, void and ineffective.

Such affirmative relief, as the foregoing paragraph provides, is available in such cases by reason of the broad remedial purposes of the Civil Rights Act and through the exercise of the equity powers of the Court. United States v. McElveen, D.C., 180 F.Supp. 10; United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535; United States v. State of Alabama, 192 F.Supp. 677 (M.D.Ala., March, 1961), 304 F.2d 583 (5th Cir., 1962); affirmed by the Supreme Court of the United States, 82 S.Ct. 145 (1962).

■ This Court further concludes that the failure and refusal by the defendants to notify rejected applicants, and/or the arbitrary rejection by the defendants of Negro applicants on technical, insubstantial, and inconsequential grounds, constitute a denial of due process of law and an abridgment of privileges and immunities of citizens under the Constitution of the United States.

The decree to be issued pursuant to this opinion will be designed to accomplish three purposes:

1. To partially correct and rectify the effects of the Board's past discriminatory practices by placing on the registration rolls immediately the Negro citizens who were rejected solely on account of their race;

2. To forbid the continuation of such discriminatory practices;

3. To establish the actual "qualification standards" under which the Board of Registrars has accepted white applicants in the past and to set forth the rules and standards which the Board is to follow in determining whether applicants are qualified to register to vote in Montgomery County, Alabama. Such a decree will facilitate registration under the federal referee provisions of the Civil Rights Act if future conduct by the defendants makes this course necessary.

■ This is the third voting rights case this Court has been required to adjudicate within the past two years.[9] In each of these cases, the findings, conclusions and decrees issued thereon emphasized the legal principle that although the particular qualifications one must possess in order to exercise this right to vote are left to the states— as long as that exercise is within the constitutional framework—the power to protect citizens who are qualified to vote but not allowed to vote solely because of their color is confided in the United States Government. This Court has demonstrated by its decrees in these cases that such protection would be afforded in this district.

■ In spite of these prior judicial declarations, the evidence in this case makes it clear that the defendant State of Alabama, through some of its officers who are under a sworn duty to support and defend the Constitution of the United States "and the laws * * * which shall be made in pursuance thereof * * *,[10] continues in the belief that

9. (1) The Macon County case reported as United States v. State of Alabama, D.C., 188 F.Supp. 759, and as United States v. State of Alabama, 192 F.Supp. 677, 304 F.2d 583 (5th Cir., 1962); affirmed by the Supreme Court of the United States, 80 S.Ct. 145 (1962); and (2) the Bullock County case, Civil Action No. 1677-N, unreported.

10. Article VI, Constitution of the United States.

some contrivance may be successfully adopted and practiced for the purpose of "thwarting equality in the enjoyment of the right to vote by citizens of the United States * * *." See Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. Such an attitude ignores the principle that the only true basis of a representative government is equality in the right to select those representatives. No such equality can exist when a class of our citizens is deprived of its right to vote because of its color. This right to vote is a personal right that is vested in qualified individuals by virtue of their citizenship. It is not a privilege to be granted or denied at the whim or caprice of state officers or state governments.

A decree will be issued accordingly; however, this Court reserves jurisdiction of this case for the purpose of enforcing or implementing the decree to be issued.

## APPENDIX A

### PROVISIONS OF ALABAMA LAW

(1) *Article VIII, Section 177 of the 1901 Constitution:*

"Section 177. Every male citizen of this state who is a citizen of the United States, and every male resident of foreign birth, who, before the ratification of this Constitution, shall have legally declared his intention to become a citizen of the United States, twenty-one years old or upwards, not laboring under any of the disabilities named in this article, and possessing the qualifications required by it, shall be an elector, and shall be entitled to vote at any election by the people; provided, that all foreigners who have legally declared their intention to become citizens of the United States, shall, if they fail to become citizens thereof at the time they are entitled to become such, cease to have the right to vote until they become such citizens."

(2) *Amendment XCVI, amendment to Article VIII, Section 178 of the 1901 Constitution:*

"Section 178. To entitle a person to vote at any election by the people, he shall have resided in the state at least two years, in the county one year, and in the precinct or ward three months, immediately preceding the election at which he offers to vote, and he shall have been duly registered as an elector, and shall have paid on or before the first day of February next preceding the date of the election at which he offers to vote, all poll taxes due from him for the two calendar years next preceding. Provided, that any elector who, within three months next preceding the date of the election at which he offers to vote has removed from one precinct or ward to another precinct or ward in the same county, incorporated town, or city, shall have the right to vote in the precinct or ward from which he has so removed, if he would have been entitled to vote in such precinct or ward but for such removal."

(3) *Amendment XCI, amendment to Article VIII, Section 181 Constitution of 1901:*

"Section 181. The following persons and no others who, if they are citizens of the United States over the age of twenty-one years and have the qualifications as to residence prescribed in section 178 of this article, shall be qualified to register as electors provided they shall not be disqualified under section 182 of this Constitution: those who can read and write any article of the Constitution of the United States in the English language which may be submitted to them by the board of registrars, provided, however, that no persons shall be entitled to register as electors except those who are of good character and who embrace the duties and obligations of citizenship under the Constitution of the

United States and under the Constitution of the state of Alabama, and provided, further, that in order to aid the members of the boards of registrars, who are. hereby constituted and declared to be judicial officers, to judicially determine if applicants to register have the qualifications hereinabove set out, each applicant shall be furnished by the board of registrars a written questionnaire, which shall be uniform in all cases with no discrimination as between applicants, the form and contents of which questionnaire shall be prescribed by the supreme court of Alabama and be filed by such court with the secretary of state of the state of Alabama, which questionnaire shall be so worded that the answers thereto will place before the boards of registrars information necessary or proper to aid them to pass upon the qualification of each applicant. Such questionnaire shall be answered in writing by the applicant, in the presence of the board without assistance, and there shall be incorporated in such answer an oath to support and defend the Constitution of the United States and the Constitution of the state of Alabama and a statement in such oath by the applicant disavowing belief in or affiliation at any time with any group or party which advocated the overthrow of the government of the United States or the state of Alabama by unlawful means, which answers and oath shall be duly signed and sworn to by the applicant before a member of the county board of registrars. Such questionnaire and the written answers of the applicant thereto shall be filed with the records of the respective boards of registrars. The board may receive information respecting the applicant and the truthfulness of any information furnished by him. Those persons who have registered as electors under the Alabama Constitution of 1901 shall not be required to register again. Provided, further, that if solely because of physical handicaps the applicant is unable to read or write, then he shall be exempt from the above stated requirements which he is unable to meet because of such physical handicap, and in such cases a member of the board of registrars shall read to the applicant the questionnaire and oaths herein provided for and the applicant's answers thereto shall be written down by such board member, and the applicant shall be registered as a voter if he meets all other requirements herein set out."

(4) *Title 17, Section 30(1), Code of Alabama 1940, Recompiled:*

"*Time and place of meeting of board in certain counties; supplementary qualified voting lists.*—In all counties in this state which now have or may hereafter have a population of not less than 100,000 nor more than 140,000 according to the last federal census or any succeeding federal census, the board of registrars shall meet at the courthouse on the second Monday in June of each year and hold daily sessions for the purpose of registering voters, and continue in session through the third Saturday in October, Sundays and legal holidays excepted. The board of registrars shall meet at the courthouse on the second Monday in November of each year and remain in session through the succeeding January, Sundays, legal holidays, and the time or times for purging the registration or poll lists excepted, holding daily sessions for the purpose of registering voters. Any voter who may become qualified after a qualified voting list has been made and published as now provided for by law during even numbered years may be added to the list of qualified voters by a supplementary list or lists without making a complete new list of qualified voters. Said sessions of the

board of registrars in all such counties shall be in lieu of all other sessions now authorized by law for registering voters."

(5) *Title 17, Section 31, Code of Alabama 1940, Recompiled:*

"*Examination and oath of applicants to register.*—The board of registrars shall have power to examine, under oath or affirmation, all applicants for registration, and to take testimony touching the qualifications of such applicants. In order to aid the registrars to judicially determine if applicants to register have the qualifications to register to vote, each applicant shall be furnished by the board a written questionnaire, which shall be uniform in all cases with no discrimination as between applicants, the form and contents of which questionnaire shall be prescribed by the supreme court of Alabama and be filed by such court with the secretary of state of the state of Alabama. The questionnaire shall be so worded that the answers thereto will place before the registrars information necessary or proper to aid them to pass upon the qualifications of each applicant. The questionnaire shall be answered in writing by the applicant, in the presence of the board without assistance. There shall be incorporated in such answer an oath to support and defend the constitution of the United States and the constitution of the state of Alabama and a statement in such oath by the applicant disavowing belief in or affiliation at any time with any group or party which advocated the overthrow of the government of the United States or the state of Alabama by unlawful means. The answers and oath shall be duly signed and sworn to by the applicant before a member of the board. Such questionnaire and the written answers of the applicant thereto shall be filed with the records of the board of registrars. If solely because of physical handicaps the applicant is unable to read or write, then he shall be exempt from the above stated requirements which he is unable to meet because of such physical handicap, and in such cases a member of the board shall read to the applicant the questionnaire and oaths herein provided for and the applicant's answers thereto shall be written down by such board member; and the applicant shall be registered as a voter if he meets all other requirements herein set out. Each member of the board is authorized to administer the oaths to be taken by the applicant and witnesses."

(6) *Title 17, Section 53, Code of Alabama 1940, Recompiled:*

"*Rules and regulations by registrars.*—The board of registrars may make such rules and regulations as it deems proper for the receipt of applications for registration and the accomplishing in as expedient a manner as possible the registration of those entitled to register, but no person shall be registered until a majority of the board of registrars has passed favorably upon such person's qualifications."

# APPENDIX B

### APPLICATION FOR REGISTRATION, QUESTIONNAIRE AND OATH

I, _____do hereby apply to the Board of Registrars of _____County, State of Alabama, to register as an elector under the Constitution and laws of the State of Alabama, and do herewith submit answers to the interrogatories propounded to me by said Board.

_____
Name of Applicant

## QUESTIONNAIRE

1. State your name, the date and place of your birth, and your present address:_____
_____
_____

2. Are you married or single:_____ (a) If married, give name, residence and place of birth of your husband or wife, as the case may be:_____
_____

3. Give the names of the places, respectively, where you have lived during the last five years; and the name or names by which you have been known during the last five years:_____
_____
_____

4. If you are self-employed, state the nature of your business:_____

    (a) If you have been employed by another during the last five years state the nature of your employment and the name or names of such employer or employers and his or their addresses: _____
_____
_____

5. If you claim that you are a bona fide resident of the State of Alabama, give the date on which you claim to have become such bona fide resident:_____. (a) When did you become a bona fide resident of_____ County:_____ (b) When did you become a bona fide resident of_____Ward or precinct_____

6. If you intend to change your place of residence prior to the next general election, state the facts:_____

7. Have you previously applied for and been denied registration as a voter:_____ (a) If so, give the facts:_____

8. Has your name been previously stricken from the list of persons registered:_____

9. Are you now or have you ever been a dope addict or an habitual drunkard:_____ (a) If you are or have been a dope addict or an habitual drunkard, explain as fully as you can:_____
_____

10. Have you ever been legally declared insane:_____ (a) If so, give details:_____

11. Give a brief statement of the extent of your education and business experience:_____

_____

_____

_____

12. Have you ever been charged with or convicted of a felony or crime or offense involving moral turpitude:_____ (a) If so, give the facts:_____

_____

13. Have you ever served in the Armed Forces of the United States Government:_____ (a) If so, state when and for approximately how long:_____

14. Have you ever been expelled or dishonorably discharged from any school or college or from any branch of the Armed Forces of the United States, or of any other country:_____ (a) If so, state the facts:_____

_____

15. Will you support and defend the Constitution of the United States and the Constitution of the State of Alabama:_____

16. Are you now or have you ever been affiliated with any group or organization which advocated the overthrow of the United States Government or the government of any State of the United States by unlawful means:_____ (a) If so, state the facts:

_____

_____

17. Will you bear arms for your country when called upon by it to do so:_____ (a) If you answer no, give reasons:_____

_____

_____

18. Do you believe in free elections and rule by the majority:_____

19. Will you give aid and comfort to the enemies of the United States Government or the government of the State of Alabama:

_____

20. Name some of the duties and obligations of citizenship:_____

_____

_____

_____

(a) Do you regard those duties and obligations as having priority over the duties and obligations you owe to any other secular organization when they are in conflict:_____

21. Give the names and post office addresses of two persons who have present knowledge of your present bona fide residence at the place as stated by you:_____

_____

_____

## OATH

STATE OF ALABAMA_____COUNTY

Before me,_____, a registrar in and for said county and state, personally appeared

_____, an applicant for registration as

an elector, who being by me first duly sworn deposes and says: I do solemnly swear (or affirm) that the foregoing answers to the interrogatories are true and correct to the best of my knowledge, information and belief. I do further solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of Alabama; that I do not believe in nor am I affiliated with, nor have I been in the past affiliated with any group or party which advocated or advocates the overthrow of the government of the United States or of the State of Alabama by unlawful means.

Sworn to and subscribed before me in the presence of the Board of Registrars this the_____day of_____, 19_____

Member of the Board of Registrars for_____County

## SUPPLEMENTAL APPLICATION FOR REGISTRATION, AND OATH

STATE OF ALABAMA_____COUNTY

Before the Board of Registrars in and for said State and County, personally appeared

_____, an applicant for registration who being by me,
(Full name of applicant)

_____, a member of said Board, first duly sworn as follows: "I do solemnly
(Any member present may administer oath)

swear (or affirm) that in the matter of the application of_____ for registration as an elector, I will speak the truth, the whole truth, and nothing but the truth, so help me God," testifies as follows:

My name is_____, and I have heretofore executed the "Application for Registration, Questionnaire and Oath" submitted to me by the above-named Board of Registrars.

In addition to the information given on said "Application for Registration, Questionnaire and Oath," I depose and state as follows:

1. I was previously registered in the following State and County in the years named_____

(If applicant has never been registered in Alabama or any other state, he should so indicate.)

2. I have never been convicted of any offense disqualifying me from registering.
(Board should call applicant's attention to Section 182, Constitution, and Title 17, Section 15, Code of Alabama 1940. If applicant cannot make foregoing statement, facts shall be ascertained and registration refused, unless fully pardoned and right to vote restored.)

3. My present place of employment is_____

4. I know of nothing that would disqualify me from being registered at this time.

## REMARKS

(Signed)_____
(Name of Applicant)

Sworn to and subscribed before me this the_____day of_____, 19_____

(Member of County Board of Registrars)

## ACTION OF THE BOARD

STATE OF ALABAMA_____COUNTY

Before the Board of Registrars in session in and for said State and County personally appeared_____

(Name of Applicant)

who executed the foregoing application in the manner and form therein stated. The Board having further examined said applicant under oath, touching his qualifications under Section 181, Constitution of Alabama, 1901, as amended, and having fully considered the foregoing Application for Registration, Questionnaire, and Oath, and Supplemental Application for Registration, and Oath as executed, adjudges said applicant entitled to be registered and he was duly registered on this the_____day of_____, 19_____, in _____precinct (or ward) in said county.

(Signed)_____
Chairman

(Signed)_____
Member

(Signed)_____
Member

(Note: The act of actually determining an applicant entitled to be registered is judicial. A majority of the Board must concur. A majority must be present. The power cannot be delegated. Each member present must vote on each application. Not until this is done may a certificate be issued the applicant.)

## EXAMINATION OF SUPPORTING WITNESS

STATE OF ALABAMA_____COUNTY

Before the County Board of Registrars in and for said State and County personally appeared

_____, who being first duly sworn as follows: "I solemnly swear
(Name of Witness)

(or affirm) that in the matter of the application of_____ for registration as an elector, I will speak the truth, the whole truth, and nothing but the truth, so help me God," testifies as follows:

My name is_____, My occupation is_____, I reside at

_____, My place of business or employment is at_____,

The name of my employer is_____. I am a duly registered, qualified elector in_____

precinct (or ward) in_____County in the State of Alabama. I have known the applicant

_____for_____years (or months). He is a bona fide resident at
(Give Applicant's name)

_____and to my knowledge has resided thereat for the past_____years (or months). I know of no reason why he is disqualified from registering under the Constitution and laws of Alabama enacted in pursuance thereof.

Space for further remarks

_____

_____

(Signed)_____

Sworn to and subscribed before me in the presence of the Board of Registrars this the_____day of_____,

19_____.

(Signed)_____
(Member of the Board)

Note: This application blank, when duly executed, on the final preparation of the "lists" of persons registered, must be delivered by the Board of Registrars to the Probate Judge of the County, whose duty it is to safely preserve it and all accompanying papers. See Title 41, Section 141, Code of Alabama, 1940.

## APPENDIX C

TRANSCRIPT OF PORTION OF TESTIMONY OF MRS. SAMUELLA P. WILLIS, GIVEN JANUARY 9, 1962

"THE COURT: Now, that—that is what I am interested in, right there. Sometime from 1956 to 1960, you testified awhile ago, you became 'more particular.'

"WITNESS: Yes, sir.

"THE COURT: And in what respects did you become 'more particular,' Mrs. Willis?

"WITNESS: Well, some of these things that we have testified about; for instance, number one in the Supplemental Oath, which asked if a person has been registered before, and if they have did they say so.

"THE COURT: Did you start—sometimes during this time did you start to grading more strictly?

"WITNESS: Yes, and that was applied to both, the same thing about this name at the top of the page, and under name of applicant.

"THE COURT: (Nodded to indicate affirmative reply)

"WITNESS: We have accepted many, many applications from both white and Negro that had no name at the top.

"THE COURT: Would you say, then, insofar as grading more strictly, sometime between '56 and '60 you raised your standards to that extent?

"WITNESS: Yes, in several ways.

[BY MR. THETFORD]:

"Q Mrs. Willis, I am not interrupting you, but those two particular things were done, I believe you testified, while you were off the Board?

"A Yes.

"Q When you left the Board, I am trying to establish a time.

"A Uh, huh.

"Q You left the Board when?

"THE COURT: That is the heart of this case.

"WITNESS: Uh, huh.

"THE COURT: That is the reason I want to question her about it.

"A '59; well, about the last of November of '59.

"Q And the last of November of '59, for example, you were not requiring—

"THE COURT: Let me be fair with you, Mr. Thetford; here, as I understand the Government's case, they come in and say that an overwhelming number of the white people in Montgomery County have been registered; a small percentage of the Negro people have been registered; the Negro people are attempting to register now, and the Board has raised their standards, and that—that is the basic complaint, as I understand it, in this whole lawsuit, and that is the reason I want this—this witness questioned about it.

"Q When—now, when did you return to the Board?

"A In February of 1961.

"Q February of 1961?

"A '61.

"Q And the old standards had been raised?

"A During the time I was off.

"Q And I believe you also testified that you did not disqualify for failing to sign the oath until when?

"A I think you will find there were a good many in '57.

"Q So you set that date at sometime in '57?

"A At sometime in '57; I might even go a little further; I wouldn't know the date, but in the investigation that was conducted in the fall of '56 there were certain applications that were investigated, and in '57 when it was resolved, that case was resolved, I—I believe that from that time, that about dates the time that we no longer accepted any that had not signed the oath. You will find during—

"Q Your—your testimony, I believe, is that the only changes that you have made in your standards—

"A (Nodded to indicate affirmative reply)

"Q —only changes that you have testified here is that you now require them to put the name of the applicant—

"A Uh, huh.

"Q —you now require them to sign the oath—

"A (Nodded to indicate affirmative reply)

"Q —and you now require them to answer—make an answer to question—is question number one in the supplement?

"A Yes.

"Q And those are the increases in your standards since—

"A I think those are the main increases.

"Q Since 1956?

"A There is another practice that we have discontinued, and that is the writing in of what in the old application was question five.

"Q You have quit writing—quit writing that in?

"A We do not do that any more.

"Q You weren't doing that, except for the precinct number, you weren't doing that for Negroes anyway?

"A Not at that time, no; that was done, and the applicant actually—I doubt that they realized it, because we did that at the time we asked when they were—became a resident of Alabama, when they became a resident of Montgomery, and when they became a resident of the precinct, and we wrote it down at that time, and I suppose the applicants thought it was routine; that was done for all who registered during that time.

"RECROSS EXAMINATION:

"BY MR. DOAR:

"Q Mrs. Willis—

"A Yes, sir.

"Q —you have also raised your standards about any little error now—

"A Yes, sir.

"Q —on the form so that if there is any date or place of residence, or is any incorrect information or omission in the form it is a ground for rejection?

"A Well, there are some things that we—I don't believe we could register if we didn't have a birth date.

"Q No, but—I know, but I am saying now, your standard now, the standard is—is a perfect application without assistance?

"A That is true.

"Q Right?

"A Yes, sir.

"Q That is true; that includes the information, question one or question two, question four—

"A (Nodded to indicate affirmative reply)

"Q —or the name in question three, and the information—

"A Uh, huh.

"Q —on question three, the Supplemental Oath—

"A (Nodded to indicate affirmative reply)

"Q —all those things now—

"A With the exception of the housewife.

"Q —have to be answered correctly? Pardon?

"A We have not been too strict about a housewife who has never been employed.

"Q I see; that is the only exception?

"A That I know of.

"Q Your answer was yes?

"A Yes, sir."

## APPENDIX D

EXCERPTS FROM TESTIMONY OF WHITE APPLICANT-WITNESSES

*Sam Henry Schuffert*, a white applicant, testified:

"Q How much education do you have?

"A I didn't finish first grade.

"Q Have you ever tried to register in Montgomery County?

"A Yes, sir.

"Q And how many times?

"A Two different times.

"Q Would you tell me about when the first time was?

"A It has been seven or eight years; I don't recollect.

"Q Just in your own words, tell the court what happened when you went down to register at that time?

"A Well, I—I went in and got a form to fill out, and I tried filling it out for an hour or two, and I couldn't do it, and I turned it back to the desk.

"Q You weren't registered?

"A No, sir."

\* \* \* \* \* \*

"Q And did you go back to the Board of Registrars again and apply to register?

"A Later; yes, sir.

"Q And you remember where that was?

"A Down on Dexter Avenue.

"Q And tell the court in your own words what happened that time when you went to register?

"A My best knowledge I went to Judge Jones' office, and lady went down and got a form and done the writing for me, and I answered the questions."

\* \* \* \* \* \*

"Q And you say she went and got the form for you?

"A Yes, sir.

"Q And she filled out the form for you?

"A Yes, sir."

*Arthur Skelton,* white testified:

"Q And what is your education?

"A Went to the seventh grade, promoted out of the seventh into the eighth.

"Q Did you have an occasion to go down and apply to register to vote in the year 1960 in Montgomery County?

"A. Beg your pardon?

"Q Did you go down to register to vote in Montgomery County in 1960?

"A I did."

\* \* \* \* \* \*

"Q You remember how many times you went down?

"A One time.

"Q And you remember—recall whether or not you were registered as a result of your application?

"A Yes, sir; they mailed me a certificate showing it."

\* \* \* \* \*

"Q Let me ask you this; after you signed the form and started to go out, tell me whether or not the registrar called you back?

"A He did.

"Q And what did he say to you at that time?

"A He told me to sign that paper if I wanted it to be any good.

"Q And you had, then, not signed in all the places he wanted you to sign?

"A I lacked one place, and that was it.

"Q You remember what place that was at?

"A No, I do not.

"Q Now, Mr. Skelton, I want to show you Exhibit C–5900, and I would like you to look at that, and directing your question—your attention to question five, is any of the handwriting in question five in your handwriting?

"A Yes, sir.

"Q This date, 'August 28, 1925,' that is your handwriting?

"A I don't believe that is.

"Q Just speak up a little louder?

"A Don't look like it.

"Q And the 'May 19, 1958'?

"A That is not mine.

"Q And do you recall whether or not the man there asked you any questions about how long you had lived in the county before you started filling out the form?

"A  No, sir.

"Q  Do you know how that writing got on there?

"A  No, sir.

"Q  Is that—how long had you lived in the county?

"A  Ever since '54.

"Q  Then this statement here, August 28—no, excuse me; you had lived in the county since 1954; is that right?

"A  Something like that.

"Q  Do you know how the date, 'May 19, 1958,' got on there, when you became a resident of Montgomery County?

"A  No, sir.

"Q  Does that date, 'May 19, '58,' mean anything to you?

"A  No, sir.

"Q  And it doesn't look like your handwriting?

"A  Sure don't.

"Q  Now, down here on questions seven, eight, and nine; are those—is that in your handwriting?

"A  Don't look like it.

"Q  Did you receive any help or instructions how to fill out the form?

"A  No.

"Q  Did you leave some of the answers blank?

"A  I don't remember.

"Q  You don't remember whether you did or not?

"A  (Shook head to indicate negative reply)

"Q  Let me ask you, this on question twenty (a), directing your—to the answer there; is that your writing?

"A  I wouldn't say.

"Q  You don't know whether it is or not?

"A  (Shook head to indicate negative reply)"

*Cecil David Boyd*, white, testified:

"Q  And after you finished with the application, what did you do?

"A  I put it in a box there that they had just for those papers.

"Q  And did you hear anything further from the board after that?

"A  Yes, I did.

"Q  What did you hear?

"A  I heard that I was to come back and see, there was an error or two in the application that I had filled out.

"Q  And did you go back to the Board?

"A  I did.

"Q  And did you make any corrections on it, on the application?

"A  I didn't, myself; no.

"Q  Did anyone else?

"A  Well, I—there was some man there with a pencil, and showed me one or two places that wasn't filled out correctly.

"Q  And did he correct those places?

"A  Well, I didn't see him if he—whether he marked them out or not." ·

\*     \*     \*     \*     \*     \*

"Q  Uh, huh; how about on question thirteen; is that you[r] handwriting?

"A  No; no, that is not it.

"Q  That is not your handwriting?

"A  No.

"Q  How about on question twenty (a), that 'Yes' there, is that in your handwriting?

"A  Don't think so.

"Q  You don't think that is in your—

"A  No.

"Q  —that is in your handwriting? How about this question on the Supplemental Oath, one, 'I was previously registered in the following state and county. Crenshaw, 1932'?

"A  No.

"Q  That is not in your hand writing?

"A  Not in my handwriting."

*Elmer Rogers*, white, testified:

"Q  And how many times did you apply to register?

"A  Once.

"Q And when you—at the time you applied, the day you applied, did you receive your certificate on that day?

"A Yes, sir.

"Q And prior to the time that you received the certificate, did the Board look over your application?

"A Yes, sir.

"Q And what did they say to you after they looked it over?

"A They told me to—that I would have to sign it.

"Q They looked over the application and then told you?

"A After I—after I finished it.

"Q Then they pointed out to you where you should sign it?

"A Yes, sir."

*Andrew A. Jackson,* white, testified:

"Q Now, in filling out this application, did anyone tell you where to sign it?

"A No, sir; nothing except just like going to a bank and making a—they made a little X.

"Q Made a little X?

"A Little teenincey X.

"Q Who did that?

"A Whoever was waiting on me there in the registration office.

"Q The registrar, that was before she signed it, she made a little tiny X where you were supposed to sign?

"A She just made a mark where—a little X where you sign, just like you go in the bank and borrow money and sign a note, and she handed me the blank, told me, 'There is a table.' I sat down and filled it out, signed it, and handed it back to her."

*William Leroy Ragland,* white, testified:

"Q What is your education? How much education have you had?

"A Seventh grade.

"Q What is your present job?

"A Welder.

"Q Did you get any help in finish—filling out this application?

"A No.

"Q Did you—after you filled it, did you take it up to the registrar and hand it to her?

"A Well, she asked me was I through, and I handed it to her, and she didn't—wasn't any office, you know, it was out in the place where there was a bunch of us was registering.

"Q After you handed it to her, did you have any talk with her about the application?

"A (Shook head to indicate negative reply)

"Q Did she—tell me whether or not she looked it over and then told you to go back and do some more on it?

"A Well, I didn't answer all the questions; she said she wouldn't accept it like that, so I finished it."

*Jack McCord,* white, testified:

"Q Are you registered to vote?

"A Yes, sir.

"Q How many times did you apply to register?

"A I went only once.

"Q And did you become registered after you applied?

"A Sir?

"Q Did you get registered after the first time?

"A Well, I disrecall just what kind of a—any—any transaction I went through, but I know that I went up to the court house to get—to get registered, and then I got a reply of where I would vote at.

"Q Do you remember filling out an application form?

"A Yes, sir.

"Q When you went in? And did you get an application form from a lady in the room there?

"A Yes, sir.

"Q And did she give you any instructions as to how to fill out the form?

"A Well, I believe that I just taken it, and I might have got some information, but I—I just taken it and sat down, and I filled it in my own handwriting.

"Q Did she explain the questions to you?

"A I asked her a couple of questions.

"Q Did she explain the questions?

"A. She—she answered them; yes, sir."