UNITED STATES of America,
Plaintiff,

v.

Victor B. ATKINS, Aubrey C. Allen, and Joseph Bibb, Registrars of Voters of Dallas County, Alabama; and State of Alabama, Defendants.

Civ. A. No. 2584.

United States District Court
S. D. Alabama, N. D.

Nov. 15, 1962.

John Doar, Attorney, Department of Justice, Washington, D. C., Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., for plaintiff.

Leslie Hall, Asst. Atty. Gen., Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., Blanchard McLeod, State Solicitor, Camden, Ala., McLean Pitts, Selma, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

This suit was filed in March 1961 under the Civil Rights Act of 1957 as amended (42 U.S.C. § 1971). The complaint seeking injunctive relief charged the State of Alabama and the Board of Registrars of Dallas County, Alabama, with having engaged in racially discriminatory acts and practices in the registration of voters. At the time the suit was filed, J. P. Majors was the only member of the Board of Registrars of Dallas County.

In May 1961—about two months after the suit was filed—Mr. Majors resigned, and a new Board of Registrars was appointed. The three new members of the Board were subsequently substituted as defendants in this case by order of the court. These defendants are Victor B. Atkins, Sr., Col. Joseph Bibb, and Aubrey C. Allen. They reside in Dallas County, Alabama. As members of the Board of Registrars of Dallas County they are agents of the defendant State of Alabama.

Dallas County, Alabama, has a voting-age population of 29,515 of which 14,400 are white persons and 15,115 are Negroes. As of the date of the trial of this case, May 2, 1962, 8,597 white per-

sons and 242 Negroes were qualified voters in Dallas County.

Between January 1952 and December 1960, ten different individuals served as members of the Board of Registrars of Dallas County. During this period the registrars registered approximately 4,500 white persons and only 88 Negroes. Only 14 Negroes were registered by the Board between June 1954 and December 1960.

Between January 1, 1952, and December 1960, the defendant State of Alabama and its agents, the registrars of voters of Dallas County, refused to register many qualified Negroes, and registered many white applicants who were not qualified.

From June 1961 up to the time of trial (May 2, 1962), the present Board has fulfilled its duties in a manner which could well be emulated by all other Boards in the United States. It is true that the present Board has had 480 white applicants, of whom 443 were registered and 37 rejected; and 114 Negro applicants, of whom 71 were registered and 43 rejected. Viewed from purely a statistical angle, the Department of Justice finds encouragement. In addition to this emphasis on statistics, the government has attacked separately and severally each application as to which it chooses not to agree with the manner in which the application was handled by the Board. The government has submitted a very exhaustive brief based on many charts attempting to prove statistically alleged discrimination and inequities on the part of the present Board. It finds fault with the Board's decision as to many applications. Well there may be differences of opinion on many of these applications. There is the human element involved in the grading of any examination paper. One person has his or her own ideas as to how a paper should be graded. Another person equally as intelligent and equally as honest may well have other ideas, and the same paper would not receive the same mark from both. The real issue is not what is shown by statistics, not whether the grading is too strict or too lax, but rather is the grading done impartially and without discrimination.

After listening to the testimony, after examining the exhibits offered in evidence, and after consideration of the briefs filed on behalf of the parties, this court is of the opinion and finds as a matter of fact that the current defendant Board against whom the injunction is sought, has not engaged in racially discriminatory acts and practices; has not applied different and more stringent standards to Negro applicants than to white applicants in determining whether such applicants are qualified to register and vote; has not unreasonably delayed the registration of Negroes; has not rejected or taken no action on the applications of qualified Negroes; has not failed to notify Negro applicants of the action or decisions taken by the Board with respect to the applications of Negro applicants; has not failed to provide a full-time Board of Registrars; has not pursued a pattern and practice of such deprivations and discriminations.

There is, however, one practice of the present Board which in the opinion of the court must be changed. This is the practice of not allowing rejected applicants, either white or Negro, to ever apply again for registration. The court does not think that a rejected applicant should be permitted to re-apply the same day. There should be some waiting period, and a sixty-day waiting period seems to the court to be fair.

The Department of Justice should recognize the work of the present Board and not insist on litigating over past inequities. To hold that inequities once committed cannot later be legally corrected is not sound. With more than six hundred applications handled by the present Board, the Department of Justice, with all of its investigative resources could find only very few instances to question. Of these, there could be the slightest doubt only as to an insignificant number.

The Department of Justice was quite correct in instituting this suit, for as I have said, the previous Board did not carry out its obligations impartially. In fact, its members did not carry out their obligations as registrars according to law. Let the Department of Justice continue to correct the inequities that, I am sure, exist in many quarters. But let it not only be satisfied, but in fact let it and the whole country be proud of the job now being done by the present Board of Registrars of Dallas County.

In approaching my duty in this case, I do so with the knowledge that there is a terrific sociological problem involved. Dallas County, Alabama, has problems which other sections do not have. They have problems which other sections do have but do not admit because of political expediency. These problems must be resolved and should be resolved by the people and not by the courts. To the credit of the Dallas County Board of Registrars, they have fairly resolved this most important problem.

## CONCLUSIONS OF LAW

The thinking of the court in this case closely parallels its thinking in the case of Mitchell v. Miller & Company, D.C., 1959, 178 F.Supp. 776. Paraphrasing the conclusions of law in that case, there is no question as to the authority of the Attorney General in the name of the United States to bring an action *for cause* pursuant to the provisions of the Civil Rights Act of 1957 (42 U.S.C. § 1971, 71 Stat. 637), as amended by the Civil Rights Act of 1960 (74 Stat. 90). When this suit was originally filed there was cause to believe that the Board as then constituted engaged in acts or practices contrary to the provisions of that Act. But in the process of enforcing the provisions of the Act, the primary purpose for which it was designed is not best served by an overzealous endeavor to bring the present Board before a court of equity for infractions of the law perpetrated by its predecessors, or for acts of judgment over which honest minds may differ. The present Board has made every effort to comply with the letter and spirit of the law, and has taken the necessary steps to eliminate the discrimination which was the basis of the suit against its predecessor Board. The evidence shows that corrections have been made and that the Board is endeavoring to comply with the law.

Quoting, as we did before (in Mitchell v. Miller, supra), from Judge Minton in Walling v. T. Buettner & Co., 7 Cir., 1943, 133 F.2d 306, at 308: "A court of equity will not afford an injunction to prevent in the future that which in good faith has been discontinued before the suit for injunction was brought,[1] and where there is no evidence that the offense is likely to be repeated in the future. Courts of equity are not to be used to punish past offenses but only in a proper case to prevent wrongdoing in the future. [Citing cases.] The remedy is never afforded on suspicion or on the ungrounded fear that the offense may be repeated in the future. * * * Employers[2] who are acting in good faith and endeavoring to comply with the law should not be harassed by the processes of a court of equity coercing them to do what they are willing to do and are trying to do voluntarily. Equity will promptly respond to meet a violation or a threatened violation, and it will as emphatically refuse its aid where none is made to appear."

It is the opinion of the court that the present Board members against whom the injunction is now being sought have not engaged in nor is there reasonable ground to believe they are about to engage in any act or practice which would

---

1. Or, as in this case, against an entirely different Board, which has discontinued the objectionable practices of its predecessors.

2. Or Boards of Registrars.

deprive any person of any right or privilege secured by subsection (a), 42 U.S.C. § 1971, i. e., the right of all citizens of the United States who are otherwise qualified by law to vote, without distinction of race, color, or previous condition of servitude, except in its practice of not allowing rejected applicants, either white or Negro, to ever apply again for registration. The injunction will issue only in so far as to require the Board to receive applications from applicants previously rejected at any regular session of the Board held sixty days after the date of the rejection.

It should be emphasized that this court is of the opinion that this case should have been resolved in pre-trial and not prosecuted as to the present Board. The government has gone to great expense in convening the court and bringing numerous witnesses from distant places, not to mention the attendant inconvenience to all parties concerned. The government offered in excess of 5,325 exhibits; and requested subpoenas for 124 witnesses, of whom approximately 110 were served and were present in court. Of these respective numbers, not more than 50 of the exhibits were referred to during the trial, and a total of 33 witnesses were put on the stand. It was apparent from the testimony that a large number of F. B. I. agents had spent many days examining these 5,000 odd exhibits, not to mention time spent by government lawyers. This expense and inconvenience was caused by the insistence of the Department of Justice upon prosecuting the petition for injunction against a Board which has, with one exception, attempted to function in compliance with the law, and this one exception could have and should have been resolved in pre-trial. This does not mean, however, that the Department of Justice erred in bringing the original suit against the former Board.

Judgment in accordance herewith will be entered.