UNITED STATES of America,
Appellant,

v.

Victor B. ATKINS et al., Appellees.

No. 20325.

United States Court of Appeals
Fifth Circuit.

Oct. 3, 1963.

Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., Howard A. Glickstein, Harold H. Greene, John Doar, Attys., Dept. of Justice, Burke Marshall, Asst. Atty. Gen., Alan G. Marer, Atty., Dept. of Justice, Washington, D. C., for appellant.

Richmond M. Flowers, Atty. Gen. of Alabama, Gordon Madison, Leslie Hall, Asst. Attys. Gen. of Alabama, Montgomery, Ala., Blanchard L. McLeod, Camden, Ala., for appellees.

Before RIVES, CAMERON and HAYS,* Circuit Judges.

RIVES, Circuit Judge.

The complaint was filed in April 1961 pursuant to the Civil Rights Act of 1957, as amended, 42 U.S.C.A. § 1971, and alleged the employment of certain racially

* Of the Second Circuit, sitting by designation.

discriminatory acts and practices in the registration of voters in Dallas County, Alabama. Named as defendants were the State of Alabama and J. P. Majors, who was then the only member of the Board of Registrars of Dallas County. In May 1961 after the suit was filed, a new Board of Registrars was appointed. The three new members of the Board, Victor B. Atkins, Sr., Col. Joseph Bibb, and Aubrey Allen, were later substituted as defendants in place of Majors. The complaint asked that the Registrars be enjoined from applying in the future different and more stringent registration standards to Negroes and asked for a number of specific injunctive and mandatory orders relating to certain practices. On November 15, 1952, the district court denied the requested relief, although it did issue an injunction whereby the Board must allow rejected applicants to apply again for registration after sixty days from the date of their rejection. United States v. Atkins, S.D.Ala.1962, 210 F. Supp. 441.

The Alabama constitutional and statutory provisions relating to the registration of voters have been set out in full in Appendix A to the opinion in United States v. Penton, M.D.Ala.1962, 212 F. Supp. 193, 202–204. It is necessary, however, for an understanding of this case that we summarize the more pertinent of those provisions.

In Alabama registration is a prerequisite to voting. Ala.Const. §§ 178, 181, 184. Registration of voters is conducted in each county separately by its Board of Registrars, which is appointed by the Governor, Auditor and Commissioner of Agriculture and Industries. Ala.Const. § 186; Code of Alabama Tit. 17, § 21 (Recompiled 1958). Under the Alabama Constitution, to be qualified to register a person must be a citizen of the United States, twenty-one years of age, and a resident of the state, county and precinct or ward for the prescribed length of time.[1] Ala.Const. §§ 177, 178, as amended. In addition, the person must be able to read and write in the English language any article of the United States Constitution submitted to him, and he must be of good character and embrace the "duties and obligations of citizenship" under the two Constitutions. Ala. Const. § 181, as amended; see Code of Alabama Tit. 17, § 32 (Recompiled 1958). The Alabama Constitution further provides that the boards of registrars, to aid them in judicially determining the qualifications of applicants, shall be furnished with a written questionnaire drawn up by the Alabama Supreme Court. The questionnaire "shall be so worded that the answers thereto will place before the boards of registrars information necessary or proper to aid them to pass upon the qualification of each applicant. Such questionnaire shall be answered *in writing* by the applicant, in the presence of the board *without assistance * * *.*" Ala.Const. § 181, as amended. (Emphasis added.) An exception is made for the physically handicapped. The applicant must sign a loyalty oath, and the board is allowed to receive information about the applicant or about the truthfulness of the information furnished by him. The Alabama Constitution disqualifies all idiots and insane persons, and those convicted of certain crimes. Ala. Const. § 182.

A statute gives the board of registrars power "to examine, under oath or affirmation, all applicants for registration, and to take testimony touching the qualifications of such applicants." Code of Alabama Tit. 17, § 31 (Recompiled 1958). The board may refuse to register anyone "who fails to establish by evidence to the reasonable satisfaction of the board of registrars that he or she is qualified." Code of Alabama Tit. 17, § 33 (Recompiled 1958). The board is given the pow-

---

1. At the time of the judgment below the residence requirement was that the person live in the state at least two years, the county one year, and the precinct three months. Effective November 16, 1962, constitutional amendment altered the times to one year in the state, six months in the county, and three months in the precinct.

er to "make such rules and regulations as it deems proper for the receipt of applications for registration and the accomplishing in as expedient a manner as possible the registration of those entitled to register." Code of Alabama Tit. 17, § 53 (Recompiled 1958). A copy of the questionnaire which was drawn up by the Alabama Supreme Court is printed in Appendix B of United States v. Penton, supra at 205–206 of 212 F.Supp. The only alterations in the questionnaire have been in the order of the questions.

■ The district court found and the evidence clearly indicates that the prior Registrars of Dallas County engaged in a pattern or practice of racial discrimination. At the time of trial, Dallas County had a voting-age population of 29,515, of which 14,400 were white persons and 15,-115 were Negroes; 8597 of the whites and 242 of the Negroes were qualified voters. Between January 1952 and December 1960, ten different individuals served as members of the Board of Registrars of Dallas County. Between those dates, 4,500 whites and only 88 Negroes were registered. Only 14 Negroes were registered from June 1954 to December 1960. The district court found that from 1954 to 1961 many unqualified whites were registered, whereas many qualified Negroes were rejected. Although the number of Negro applications which were rejected and the identity of the applicants are not known, testimony showed that among those rejected were two doctors, six college graduates, and two persons with some college education. It was the practice of the board not to notify applicants of rejection. Whites were not always required to fill out application forms themselves or to understand the questions thereon. Of the applications surveyed, analysis showed that 47% of the white applications accepted were filled out in whole or in part by someone other than the person signing as the applicant—a clear violation of section 181 of the Alabama Constitution and title 17, section 31 of the Code of Alabama. The reappearance of answers which use precisely the same language in

numerous applications (one answer appears 1160 times) indicates that the assistance was given by the registrars themselves. And in those white applications which were filled out by the applicant, the numerous errors and omissions which they contained were disregarded.

From November 1960 until the present Board of Registrars took over in June 1961, there was no functioning board of registrars in Dallas County. Before taking office, the new members of the Board made an inquiry into the registration laws of Alabama, and, without reference to the practices of their predecessors, instituted a number of changes in procedure: 1) The questionnaire has now become a test and must be correctly filled out, although no set standards for grading them have been devised. 2) Applicants are asked oral questions, usually about the meaning of the United States or Alabama Constitution. 3) Inquiries are made into the character and reputation of the applicants. 4) Notice of acceptance or rejection is now given to all applicants. 5) Once rejected by the present Board, no applicant could reapply. The last of these practices was halted by the injunction issued by the district court.

■ The district court found as a fact that the present Board of Registrars has not engaged in racially discriminatory acts and practices, has not pursued a fulltime pattern or practice of discrimination, and has not been more stringent in its requirements to Negroes than to whites. The court found that the present Board "has made every effort to comply with the letter and the spirit of the law, and has taken the necessary steps to eliminate the discrimination which was the basis of the suit against its predecessor Board." The United States attacks this finding and asserts that the new practices are applied so as to be merely a more sophisticated form of discrimination than that practiced in the past.

This Court may not set aside findings of fact of the district court unless they are "clearly erroneous." Fed.R.Civ.P.

52(a). A study of the evidence in this case does not convince us that the district court was clearly in error in finding that the present Board is not engaged in racial discrimination. From June 1961, when this Board first met, to the time of trial, May 2, 1962, there had been 480 white and 114 Negro applicants. Of the 480 whites, 443 were registered and 37 rejected. Of the 114 Negroes, 71 were registered and 43 rejected. That is, about 92% of the whites and about 62% of the Negroes were accepted.[2] The appellant (the United States) asserts that since the percentage of Negro rejections is much greater than white rejections, even when applicants are broken down into different educational groups,[3] the current Board must not be treating Negroes on the same basis as whites. But taking into consideration the numerous factors which determine registration under the standards the Board was using and the relatively small figures on which the percentages are based, we cannot say that these figures indicate that the finding of the district court was clearly erroneous.

The appellant goes on to cite specific ways in which it claims that the new and more stringent requirements are being applied in a discriminatory fashion. The question of whether these requirements, absent proof of discrimination by the present Board, may be sustained, will be treated later in this opinion. The appellant asserts that the Board was more strict in grading Negro applications. It particularly points to the questions relating to residence requirements. There are several questions which ask for this information; the principal one, which for convenience we shall call question 5, although the numbers sometimes differ, states:

> "5. If you claim that you are a bona fide resident of the State of Alabama, give the date which you claim to have become such bona fide resident: .......... (a) When did you become a bona fide resident of .......... County: .......... (b) When did you become a resident of .......... Ward or precinct .........."

The confusing phraseology of this question has already been noted by this Court. Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, 588–589 n. 14, aff'd per curiam 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). Other questions ask for the applicant's present address, place of birth, and address for the past five years. One of the Registrars testified that if question 5 were left blank by a Negro, but was indirectly answered in another place, the Board would give him credit for it. Nevertheless, Anna Perry, Negro, who left out question 5 completely, was rejected even though the form was otherwise correct and the necessary information was elsewhere on the form.[4] On the other hand, W. A. Williams, Jr., an accepted white applicant, gave a date for part (a) which would have disqualified him; however, other parts of his application revealed he had lived in Dallas County for two years, and he was accordingly accepted. Another white, Sara Melton, left 5(a) blank and two others also left 5(a) blank, but answered 5(b); all of these

---

2. These figures are based on the testimony given at the trial and the findings of the district court. The United States, in its briefs before this Court and the trial court, has used slightly different figures. It asserts that of 468 whites, 425 were accepted, and of 115 Negroes, 70 were accepted. Except for one of these figures, the reason for the discrepancy is unexplained.

3. The Government chart, however, results in the same discrepancy pointed out in note 2, supra.

4. Rejected Negro applicant Kathleen Harris left out parts (a) and (b) to question 5, but answered the question "Are you married or single" by putting down "yes." She did go on to give the name of her husband. Rejected Negro applicant Minnie Shelton failed to answer parts (a) and (b) and also answered "yes" to the marital status question; however, she did not give the name of her husband, if she had one.

were accepted on other information in the form. These applications tend to support the appellant's position. The appellant also points to Negroes who were rejected for having errors or omissions in other parts of the form, whereas some whites were accepted who also had errors or omissions. However, there is pointed out no instance where a Negro was rejected solely for the exact error or omission which an accepted white person had made. The Registrars testified that they considered some questions more important than others. Both whites and Negroes were rejected for seemingly trivial errors.[5]

The appellant also insists that the Board made discriminatory use of oral questions. After an applicant had completed his questionnaire, he would be called into a small office and asked to answer orally one or two questions. Usually, they were asked what is the Constitution of the United States, or what is the Constitution of the State of Alabama. Sometimes they were asked what their duties under the Constitution are, what is the Bill of Rights, who is the Governor of Alabama, or what does "secular" mean. The members of the Board testified that they believed that all applicants were asked oral questions, but three whites testified that they do not recall being asked any oral questions. No record was kept of what questions each applicant was asked nor of the answers received. The only written notation concerning these questions would appear on the notices of rejection of those who had unsatisfactorily answered them—comments such as, "no understanding of the Constitution." Records show that 11 Negroes and 13 whites were rejected on the basis of their oral answers. It is true that these figures mean that a greater per cent of the total Negro applicants gave unsatisfactory answers than the white applicants, but the figures also indicate that of those whites who were rejected, a greater percentage

were rejected on this basis than Negroes who were so rejected, compared to the total number of Negro rejections. The appellant points out that of the Negroes who gave unsatisfactory answers, three were teachers and two had high school educations; however, four of the whites also had high school educations. To the extent whites were not required to answer such questions and Negroes were required, this is an indication of discrimination. Yet, there is no proof in the record that all Negroes who applied were asked such questions nor was there proof of the extent to which whites were allowed to register without being asked oral questions. Also, there is no proof which would allow a comparison of the difficulty of the questions asked each class, nor of the quality of the answers deemed acceptable for each class.

Taken together, the above evidence and the other comparisons made in appellant's brief would have certainly formed a valid basis on which the district court could have found the present Board to be discriminating. Indeed, it is possible that the Board is discriminating, but to rule that it was clearly erroneous for the district court to find otherwise is another matter. At this time, the evidence of discrimination is not that compelling. But, as the rest of this opinion indicates, this finding does not mean that the practices of the present Board cannot or should not be improved. The possibility of discrimination, as shown by the evidence and the practices of the Board, warrant close inspection of the future activities of the Registrars.

■ There are, then, a number of important questions raised by this case which remain to be settled. The appellant has asked that the State of Alabama and the Board of Registrars of Dallas County be enjoined from engaging in any act or practice which results in racial discrimination in the registration for voting

---

5. This case is not like United States v. Penton, supra, which found the rejection of whites for trivial errors after the suit was brought to be a sham, or an attempt to cover up past practices. Here, we have a new Board whose bad faith was not proved to the satisfaction of the district court.

in Dallas County. But the appellees insist that since it was the prior Boards which engaged in discrimination, and not the present Board, the case is moot or, if not moot, it was not an abuse of discretion by the district judge to deny such an injunction.

It is clear that this case is not moot. In United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, the Court said that the voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, for the defendant is free to return to his old ways and there is a public interest in having the legality of the practices settled.

> "The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. *Such a profession does not suffice to make a case moot \* \* \*.*" 345 U.S. at 633, 73 S.Ct. at 897, 97 L.Ed. 1303. (Emphasis added.)

The only assurance that this or another Board will not return to the discriminatory practices is the word of the present Registrars, not binding on those who may hereafter be appointed.[6] This is not sufficient to make the case moot. See Derrington v. Plummer, 5 Cir., 1956, 240 F.2d 922, cert. den. 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957); Anderson v. City of Albany, 5 Cir., 1963, 321 F.2d 649; California Oil Co. v. Huffstutler, 5 Cir., 1963, 322 F.2d 596.

The real question, then, is whether it was an abuse of discretion by the trial court to refuse to grant the injunction. We believe that it was. In United States v. W. T. Grant Co., supra, the Court also held that along with a court's power to hear the case, the power to grant injunctive relief survives discontinuance of the illegal conduct, since the purpose of an injunction is to prevent future violations. But the moving party must satisfy the court that relief is needed. There must exist some cognizable danger of recurrent violation, more than a mere possibility; and a strong showing of abuse of discretion must be made to reverse the Chancellor's decision. The Court said the following factors should be considered: 1) the bona fides of the expressed intent to comply, 2) the effectiveness of the discontinuance, and 3) in some cases, the character of the past violations.

It should be recalled that the State of Alabama is a party to this action and is responsible for the discriminatory acts and practices of the registrars. This is expressly provided for in 42 U.S.C.A. § 1971(c) as amended by the Civil Rights Act of 1960, § 601(b):

> "Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant \* \* \*."

See United States v. Alabama, 1960, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (per curiam); [7] United States v. Mayton, S.D.Ala.1962, 7 Race Rel.L.Rep. 1136.

---

**6.** The Registrars serve at the will of the appointing board as shown by Code of Alabama, 1940, Title 17, § 22:

"§ 22. *Terms of office.*—The registrars so appointed under this article may be removed at the will of the appointing board, or a majority of the members thereof, at any time, with or without cause, and without giving their reasons therefor; and if not so removed, the registrars may hold office for four years from the time of their appointment and until their successors are appointed."

**7.** In that case, the Supreme Court intimated no views upon "any defenses, constitutional or otherwise, that may be asserted by the State." We follow the same course in the present case.

■ We have already indicated the flagrant and open manner in which the rights of the Negro citizen to register to vote were willfully and deliberately disregarded in Dallas County between January 1952 and December 1960. This was made even more acute by the unlawful registration of unqualified whites. We believe that the consistent and extreme form of discrimination engaged in by the former Boards is a significant factor to consider in determining the likelihood of future violations.

In addition, we have pointed out a number of incidents which tend to indicate a possibility that the present Board may be discriminating against Negroes. Even a small amount of discrimination would be greatly inflated in importance by the Board's practice of not allowing further applications after rejection—a practice which the district court rightly enjoined. Most important of all in this determination are those practices of the present Registrars which make it difficult, if not impossible, to determine whether the Board is discriminating. These include the grading of the questionnaire as a test, especially the lack of any standards whatsoever of grading them; the use of oral questions without recording to whom they were asked, what questions were asked, or what answers were given and without deciding on any standards; and the failure to keep any record of the exact reason for rejection.

Although we cannot say that the district court was clearly erroneous in finding that the present Registrars are trying in good faith to comply with the law, it should be recalled that this Board took over after this suit had already been commenced and knew that its actions would be carefully reviewed in the coming trial. All of the factors considered, this Court cannot help but conclude that there is a cognizable danger that there would be some amount of discrimination should the lower court's judgment be affirmed

without modification. Indeed, the considerations in this case are even stronger than in Derrington v. Plummer, supra, in which the lessee of a cafeteria in a county courthouse segregated the facilities, but the lease expired. And it is stronger than in Anderson v. City of Albany, supra, in which there was a voluntary closing of the segregated facilities and repeal of the segregation ordinances. The Registrars here, or future Registrars, could resume discrimination without going through any formalities whatsoever. Finally, we believe that the language of the statute, itself, supports our conclusion. It speaks in terms of past and future practices only, and never in terms of continuing or present practices:

> "Whenever any person *has engaged* or there are reasonable grounds to believe that any person *is about to engage* in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute * * * a * * * proceeding for preventive relief * * *. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to *have committed* any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, *if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office,* the proceeding may be instituted against the State." 42 U.S.C. § 1971(c). (Emphasis added.)

■ A general injunction against discrimination, then, should have been ordered by the district court.[8] The ap-

---

8. That injunction should be addressed to the Registrars and their successors in office, but, so long as there is a functioning Board of Registrars, it should not be addressed to the State. If a State can properly be enjoined (see n. 7, supra), that should be done only when absolutely essential to afford effective relief.

pellant also seeks several specific orders designed to spell out for the Registrars just what is expected of them and what practices they may follow. A number of these orders relate to the Board's treatment of the questionnaire. It is asked that the Registrars be ordered to 1) cease using the questionnaire as a tricky exam or test, 2) cease rejecting applicants for errors or omissions in the questionnaire if other answers on the form reveal the applicant is qualified, 3) treat an applicant's willingness to sign and swear to the oath as sufficient evidence that he embraces the duties and obligations of citizenship, and 4) call an applicant's attention to any inconsistencies between his answers or between his oath and his answers. Other than the Civil Rights Act, 42 U.S.C. § 1971(c), the appellant puts forward two grounds for this or similar relief: The practices of the Registrars are not in accordance with Alabama law and the practices violate the fourteenth and fifteenth amendments to the United States Constitution. It is necessary that the State law be construed before we may pass on the constitutional questions, since the determination as to Alabama law might obviate the necessity of reaching the problems of constitutionality. While this Court has ancillary jurisdiction over the question of state law, see Siler v. Louisville & Nashville R.R., 1909, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753, the parties are authorized to reopen this issue at a later date should a state court reach a different conclusion. See Hart & Wechsler, The Federal Courts and the Federal System 865 (1953).

We have already summarized the applicable provisions of the Alabama Constitution and statutes. The appellant argues that section 181 of the Alabama Constitution provides that the purpose of the questionnaire is "to aid the members of the boards of registrars * * * to judicially determine if applicants to register have the qualifications hereinabove set out"—i. e., citizenship, age, residence, sanity, lack of certain criminal convictions, ability to read and write any

article of the Constitution, good character, and embrace the duties and obligations of citizenship. The appellant also points to section 33 of title 17 of the Alabama Code, which states that the applicants must establish to the *reasonable* satisfaction of the Board that they have these qualifications. Finally, the appellant relies on rejection of a proposed constitutional amendment to section 181 in a referendum held May 1, 1962. The amendment would have provided for both an application form and an examination. All examinations would have been graded by a state board of examiners. The appellant asserts that this amendment, proposed by the Alabama legislature, indicates that the legislature does not consider that the Constitution allows for an examination and shows a dislike on the part of the people for such a system of registration.

Section 181 of the Alabama Constitution attempts to make the registrars judicial officers and their determination of the qualifications of applicants a judicial determination. This would seem to give them broad discretion in the treatment of answers to questions which relate to qualifications. Section 181 also states that the application form must be answered in writing without assistance. There would seem to be a point where an application might contain enough errors and omissions that the Board could determine that this requirement had not been satisfied. The statutory limitation of reasonableness goes far to bring a proper use of the questionnaire into compliance with the United States Constitution. Although the defeated amendment may be interpreted so as to lend weight to appellant's argument, it might also be interpreted as intended to take away some of the discretionary powers of the Boards and to institute uniformity throughout the State by requiring an examination in every county and a consistent method of grading.

The appellant contends that the Registrars' method of treating the questionnaire is so vague and unreasonable as to violate the fourteenth and fifteenth

amendments of the United States Constitution. The case of Davis v. Schnell, S.D.Ala., 81 F.Supp. 872, aff'd per curiam, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949), involved a consideration by a three-judge district court of the so-called "Boswell Amendment" to the Alabama Constitution. This predecessor to the present section 181 required every applicant for registration to be able to "understand and explain" any article of the federal Constitution. The Court struck down the Boswell Amendment, applying the following test:

"Do the words 'understand and explain' as used in the Boswell Amendment furnish a reasonable standard whereby boards of registrars may pass on qualifications of prospective electors, or are these words so ambiguous, uncertain, and indefinite in meaning that they confer upon said boards arbitrary power to register or to refuse to register whomever they please." 81 F.Supp. at 877.

The court pointed out that the words "understand" and "explain" had many meanings and that the members of the boards were not learned in the law. The court went on to say:

"No uniform, objective or standardized test or examination is provided whereby an impartial board could determine whether the applicant has a reasonable understanding and can give a reasonable explanation of the articles of the Constitution * * *. Under such a test with proper questions or guides a record could be made which would give a rejected applicant a definite basis upon which he could seek and obtain a proper judicial review of the board's action, and the reviewing court would have something definite to act upon in ascertaining whether an applicant had been rightfully or arbitrarily and unjustly denied the right of suffrage." 81 F.Supp. at 877.

The court concluded that the words "understand and explain" did not provide a reasonable standard and gave the Registrars the arbitrary power to accept or reject any prospective elector who applied. In fact, legislative and current history showed that the purpose of the amendment was to restrict the voting rights of Negroes. The decision was affirmed, per curiam, by the Supreme Court. Schnell v. Davis, 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093; see also Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

 The testimony of the Registrars reveals that they have no set standard for the "grading" of questionnaires. They could not say what incorrect answers or omissions, or combination of these, would result in rejection. If confronted with particular application forms which they had rejected, they could not be sure which of the answers formed the basis of their rejection. This is precisely the sort of practice condemned in Davis v. Schnell, supra. The Board, if it wishes to continue "grading" application forms as a test, must adopt uniform objective standards. These standards must be such as to furnish a rejected applicant a definite basis upon which to seek proper judicial review of the Board's action, and must furnish reviewing courts something definite to act upon in ascertaining whether he had been arbitrarily or unjustly denied the right of suffrage. The Board should keep a record of exactly which answers or omissions contributed to rejection of any applicant, and this information should be available to the applicant if he later inquires of the Board as to more specific reasons for his rejection. We will not attempt at this time to define how strictly the Board may grade or which questions may form a basis for rejection while remaining within the requirements of the Alabama law and the federal Constitution. Should the Board decide to continue using the form as an exam, the new standards which it adopts may then be tested in the courts; also, the new standards will form a more ready basis for the appellant to reopen the question of discrimination, if any evidence of this is discovered. Un-

less the Board's new standards turn out to be unreasonable in some respect, we see no reason to require the Board to fill in information on the questionnaire for the applicants; section 181 of the Alabama Constitution clearly states that the questionnaire be answered in writing by the applicant and without assistance.

The appellant has asked that the Registrars be required to cease asking the applicants oral questions about the Constitution or about terms on the application form. Again, it is argued that this practice is not authorized under State law and is prohibited by Davis v. Schnell, supra.

Section 31 of title 17 of the Code of Alabama states that the board of registrars "shall have the power to examine, under oath or affirmation, all applicants for registration, and to take testimony touching the qualifications." Thus, the board may ask oral questions if they relate to the qualifications of the applicant and if they are reasonable. But the present Board has no set questions nor any method of determining which questions a particular applicant is asked. Nor has it any standards by which it may determine what is a correct answer. Finally, the Board keeps no record of the questions asked or of the answers given. Clearly, the Board cannot continue asking oral questions unless it decides on a specific set of questions which meet the requirements set out in the Davis case. Moreover, a system for selecting the questions asked of any particular applicant and for grading the answers must be devised; it must be a system which is fair and without discrimination. Finally, records should be kept of the exact questions asked and the answers thereto.

The appellant also objects to the rejection of applicants for lack of good character on the basis of secret evidence secretly considered, and without offering the applicant an opportunity to refute the evidence thus obtained. The Board rejected one Negro on the basis of affidavits of bad reputation. It was inferred that she had committed adultery, given birth to an illegitimate child, and participated in a conspiracy to commit murder. The applicant, who denied these accusations at the trial, was given no opportunity by the Board to refute the affidavits. We agree with the appellant that due process makes a hearing necessary. The due process requirements of notice and hearing were discussed by this Court in Dixon v. Alabama State Board of Education, 5 Cir., 294 F.2d 150, cert. den. 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), which held that a tax-supported college must provide notice and opportunity for hearing before expelling a student. In Dixon we said that it was necessary to consider the nature of the private interest which has been impaired and the governmental power which has been exercised. The right to vote is one of the most important and powerful privileges which our democratic form of government has to offer. Although state governments may regulate this right, they are subject to close judicial scrutiny when doing so and are limited by the fifteenth amendment in addition to the fourteenth. We hold that the Board could not deprive a person of the right to register to vote on the basis of secret evidence without affording notice and an opportunity for hearing.

The appellant uses a "freezing" theory to justify two important requests: 1) that an order be issued compelling the immediate enrollment of named Negroes who had applied in the past and who possessed, at the time of application, the qualifications of the least qualified white person who applied during the same year and was registered; 2) that the Registrars be ordered to register Negroes in the future who possess the qualifications required of whites during the period 1952–60.

Freezing results when there have been past discriminatory practices, these practices are discontinued, but some action is taken which is designed to retain the status quo, the position of advantage which one class has already obtained over the other. One extreme example in the area of voter discrimination would be

an instance when there is permanent voter registration and in the past only whites have been allowed to register; if suddenly all registration of both whites and Negroes is stopped, the effect would be to freeze the white position of power. To a lesser extent there would be some freezing whenever discrimination is discontinued but the registration requirements are made more strict than when discrimination was practiced.

. From 1952 to 1960 the then existing Board of Registrars of Dallas County was extremely lax in the registering of whites. Often the Registrars, themselves, furnished the answers to and filled out the questionnaire. This was in complete disregard of section 181 of the Alabama Constitution. The effect of the relief now asked would be to "freeze" the unlawful practices of the prior Boards into a permanent policy. Not only would the legislature or the people of Alabama be unable to alter the requirements for registration, but the present Board would be required to violate the law as it now exists and has existed.

 We do not dispute the power of the federal courts to invoke the freezing principle to give relief when necessary. It has been used before in voting cases. In United States v. Dogan, 5 Cir. 1963, 314 F.2d 767, whereas formerly only Negroes were required to see the Sheriff personally to pay poll taxes, new instructions required any person, white or black, to see the Sheriff if they were paying for the first time. This Court found that the new instructions operated to the disadvantage of Negroes for the following reason:

"*Substantially all* of the 5,099 white persons of voting age who were liable to pay a poll tax have been permitted to do so while *not one* of the County's 6,483 Negroes of voting age has been listed as paying the tax. Obviously a blanket requirement that all persons who have never paid the poll tax before, that being a relatively small percentage of white people and all Negroes, who now desire to pay their poll tax for the first time must see

the Sheriff personally operates unequally and discriminatorily against the Negroes." 314 F.2d at 772. (Emphasis added.)

The appeal being on a preliminary injunction, the Court did not pass on what relief should be given. Other voting cases relying on the freezing principle include two cases relating to the Oklahoma "grandfather clause," Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340, and Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. Several school segregation cases have also used the principle. See, e. g., Ross v. Dyer, 5 Cir. 1962, 312 F.2d 191; Taylor v. Board of Education, 2d Cir., 294 F.2d 36, cert. den. 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). But since the use of this principle necessarily prevents the state from passing otherwise valid regulations, it should be invoked only where there is a great need for it. To apply the freezing idea too freely would mean that no state which has discriminated against Negro voting rights in the past could ever tighten its qualifications the least bit. Moreover, when the application of this principle would mean that the Board must in the future continue to violate state law as did its predecessors, the principle should be used, assuming such use could ever be justified, only if there were no other alternative by which justice could be reached. See United States v. Fox, E.D.La.1962, 211 F.Supp. 25; United States v. Ramsey, S.D.Miss.1963, 8 Race Rel.L.Rep. 156. But see United States v. Penton, M.D.Ala.1962, 212 F. Supp. 193.

As has been stated, Dallas County had at the time of trial a voting age population of 29,515 of which 14,400 were whites and 15,115 were Negroes; there were 8,597 whites and 242 Negroes who were qualified voters. The freezing effect which appellant complains of results from several factors. On the one hand there are those whites whose registration did not comply with even the minimal requirements of State law. We believe that there is a less radical remedy for this injustice than the one suggested by

the appellant. Rather than making such unlawful practices a permanent fixture in Dallas County, the district court could, on petition by appellant, purge from the registration list those persons proved by the appellant to have been registered by a procedure which does not meet the minimal requirements of State law. These persons could then reapply for registration subject to the same requirements as everyone else. Such relief would be within the broad equity powers recognized in Alabama v. United States, 5 Cir., 304 F. 2d 583, aff'd per curiam, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). On the other hand are those practices of the present Board which are so strict as to be outside the permissible limits of Alabama law or the Constitution. The procedure of the Registrars which would have had the greatest freezing effect was the practice of not allowing rejected applicants to reapply. The district court, however, eliminated that problem. Other practices of the Registrars beyond the limitations of the Constitution and Alabama law soon will be eliminated pursuant to this opinion. The only remaining freezing effect could come as a result of differences of practices allowable within the zone of permissible interpretation of Alabama law. Where in this zone, or how strictly the Board will interpret Alabama law, is yet to be determined. As long as there is the ability to reapply, it is unlikely that within this zone there would be any freezing effect so great as to amount to an injustice. That determination, however, might better be made when the specific facts and figures are before the Court.

If the Registrars of Dallas County are in fact making a good faith attempt to register voters without discrimination as to race or color, as the district court found, then they are to be commended. The improvements in procedure suggested in this opinion are designed to make in the future the bona fides of the Registrars a matter of clear public record. If, however, the Registrars have not been acting in good faith, the suggestions contained herein should serve to bring out into the open any discrimination practiced, so that appropriate steps may be taken to correct it.

In summary, the district court should enter a judgment or decree enjoining the members of the Board of Registrars of Dallas County, and their successors in office, from engaging in any act or practice intended to result or the probable effect of which would be to result in racial discrimination in the registration for voting in Dallas County. The defendant Registrars and their successors in office should be ordered to cease rejecting applicants for errors or omissions in the questionnaire when other answers or information reveal that the applicant is qualified, and to cease using the questionnaire as an examination or test, *unless* the Registrars present to the court and propose to use a definite set of standards for the grading of questionnaires, which said standards shall meet with the approval of the court as complying with state and federal law. They should likewise be ordered to cease asking applicants oral questions, unless the questions comply with state and federal law, and unless the defendant Registrars and their successors in office keep records of the exact questions asked of and answers given by each applicant. The court should order them to cease rejecting applicants for lack of good character, not evidenced by convictions for crime specified in the Constitution or laws of Alabama, without giving the applicant notice and an opportunity for a hearing. They should further be ordered to keep records of the exact reasons for the rejection of any applicant and to reveal these reasons to any applicant who inquires as to specific reasons for his rejection.

The judgment of the district court is reversed and the cause remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

CAMERON, Circuit Judge (concurring specially in the result).

If the responsibility of deciding this case were mine alone, I would go with

the able District Judge who summed up his estimate of the character of the service of the appellees by stating in his findings: that "the whole country [should] be proud of the job now being done by the present Board of Registrars of Dallas County."

But I am impressed with the statesmanlike approach of the majority in the consideration and decision of this case as exemplified in the scholarly opinion which has been filed; and I am impressed also from the record that these Registrars have in good faith followed, and intend to continue practices conforming closely to those prescribed in the injunctive order which the majority directs to be entered.

I, therefore, concur in the result.