**UNITED STATES of America,**
**Appellant,**

v.

**Joseph T. SCARBOROUGH, Joe E. Bennett, W. F. Harper, as Registrars of Voters of Perry County, Alabama, and State of Alabama, Appellees.**

**No. 22305.**

United States Court of Appeals
Fifth Circuit.
June 30, 1965.

See also 5 Cir., 348 F.2d 174.

James L. Kelley, Harold H. Greene, Howard A. Glickstein, Attys., Dept. of Justice, Washington, D. C., Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., John Doar, Acting Asst. Atty. Gen., David Rubin, Atty., Department of Justice, Washington, D. C., for appellant.

Gordon Madison, Asst. Atty. Gen., Frank J. Mizell, Richmond M. Flowers, Atty. Gen., Leslie Hall, Asst. Atty. Gen., Montgomery, Ala., for appellees.

Before TUTTLE, Chief Judge, and EDGERTON * and SMITH,** Circuit Judges.

TUTTLE, Chief Judge:

This appeal deals with the standards to be employed by a Voting Referee appointed pursuant to 42 U.S.C.A. Supp. V, 1964, § 1971(e) in determining whether an applicant is qualified to vote. It is a companion case to United States of America v. Scarborough, et al., No. 21,860, 348 F.2d 174 decided today. We conclude that the Voting Referee failed to apply the standards required by the said provisions of the Civil Rights Act in that he required applicants for registration to satisfy "Qualifications more stringent than those used by persons found in the proceeding to have violated subsection (a) in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist"; that the trial court was clearly in error in not rejecting the findings of the Registrar and in confirming the Referee's reports "in all respects". We further conclude that in this suit, filed nearly three years ago and having appeared several times in this court, there must be an immediate end to the plain denial of the constitutional rights of qualified Negro applicants in Perry County, Alabama, and to this end we conclude that we must order certain applicants to be registered by name, based on the record before this court.

On November 15, 1962, the District Court found that the Board of Registrars of Perry County, Alabama had "engaged in acts and practices which have had the purpose and effect of depriving Negroes of their right to register without distinction of race or color." The

---

* Senior Circuit Judge of the D.C. Circuit, sitting by designation.

** Of the Third Circuit, sitting by designation.

Court enjoined continued discrimination and it ordered the Board thenceforth to register any applicant who met the following qualifications:

"(a) He is a citizen of not less than twenty-one years of age.

"(b) He has resided in the State two years, in the county six months, and in the precinct three months.[1]

"(c) He embraces the duties and obligations of citizenship.

"(d) He is not disqualified by reason of bad character, conviction of a disqualifying crime, insanity or idiocy, habituation to drink, or dope addiction.

"(e) He is able to demonstrate his ability to read or write by answering the questions on the application form and questionnaire."

In addition, the Court enjoined the Board "from rejecting applicants for formal, technical and inconsequential errors or omissions on their application forms".

Following a subsequent appeal to this Court, in which we held that the letters submitted by 142 (later increased to 175) Perry County Negroes satisfied the requirements of § 1971(e) for an "application", the District Court entered an order appointing O. S. Burke, Esquire, Voting Referee in this case. The Referee mailed questionnaires to a group of Negroes who had already filed applications with the court. This called for the applicant's name, address, race, whether the applicant had filed an application form (and, if not, why not), and whether he had been registered. The applicants filled out the questionnaires and, in accordance with instructions thereon, mailed them to the Referee. Thereafter, the referee mailed a notice to each of the Negroes whose executed questionnaire showed that he was still not registered. This notice stated that the addressee's application would be heard in the courtroom of the Perry County Courthouse at a specified hour on September 23, 1963.[2]

On September 23, 1963, 97 Negro applicants presented themselves to Referee Burke at the Perry County Courthouse for the hearing. Each applicant was again required to fill out a "Registration Application" which had been devised by Referee Burke. The questions on this mimeographed form asked for the applicant's name, address, age, and information concerning his residence, character, poll tax payments, previous attempts to register (including time, place, and reason, if given, for rejection), education, loyalty, and military service. While this "Registration Application", was apparently designed as a means of eliciting relevant information and not as a test, it, nevertheless, required information which carried it beyond that required by the county Registrars following the trial court's injunction. But this was not all that Burke expected of the applicants. Following completion of this application, the Referee instructed the Negro applicants to write down from his oral dictation Article V of the United States Constitution.[3] The applicant was then re-

[1]. The residence requirements have since been somewhat modified.

[2]. Although it is not in any way determinative of the issues here, it is significant that the procedure up to this point involved more trouble, a greater ability to read and write, and a more sustained desire to register than had been required of the white registrants prior to the trial court's injunction. However, as will be noted, this was just a beginning of the procedure required of the Negro applicants.

[3]. This Article, consisting of 134 words, is as follows:

"The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the

quired to take what was called a "Literacy" test. This was comprised of four questions [4] about Article V, and, in answering it the applicant was permitted to refer only to what he had succeeded in writing down from the Referee's dictation. The applicant was then required to take a "Citizenship" test requiring answers to factual questions regarding the government of Alabama and of the United States. While not a difficult test, it nevertheless went beyond the requirements of the District Court's stated order for the state registrars.

Between October 16th and October 23rd, 1964, Referee Burke submitted to the Court a total of 209 reports. Of these, 24 applicants were found to be qualified, 110 applicants were found to be not qualified, 60 applicants had been registered by the County Board after their applications were filed, 13 applicants did not appear for a hearing, and 2 no longer resided in Perry County. The United States filed exceptions to the Referee's findings as to 82 of the 110 applicants whom the referee had found not qualified to vote under State law. On November 2, 1964, the District Court overruled the exceptions of the United States to the Referee's reports. The order does not indicate the basis of the court's ruling. But on November 18th, it entered an order confirming the Referee's reports "in all respects". The basis of the Government's exceptions was that, as to the 82 applicants, it was contended that they had met all of the standards and possessed all of the qualifications enumerated in the court's original decree, and that this must be taken to indicate the trial court's determination

of the qualifications theretofore used by the County Registrars "in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist". 42 U.S.C.A. 1971(e).

It is apparent from what has been said that if the Negro applicants who persisted far enough in their desire to register to vote in Perry County, thought that after the District Court appointed a Federal Referee their troubles were at an end, they were sadly mistaken. It is plain that many of the alleged vices in the applied, as contrasted with the statutory, standards used by the County Registrars were carried over into the plan concocted by the Referee in carrying out his function under the court's appointment. In doing this, the referee clearly acted contrary to the statute. While the trial court did not make an express finding of the qualifications which had been used by the Registrars for white applicants during the time when it found them to have practiced discrimination, it must be presumed that the conditions contained in its injunctive order which must apply to future applications represented what it found to be the basis on which the County Registrars had theretofore been qualifying white applicants. Such a conclusion would seem so obvious and any departure in the nature of imposing more rigid requirements by the Referee would appear so clearly improper, that it is surprising, indeed, that the trial court did not require the Referee to adhere to this set of standards.

■ This Court, in United States v. Duke, 332 F.2d 759, and United States

---

Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate."

4. These questions are as follows:
"1. States may ratify amendments to the Constitution by two methods—Name them.

"2. In order for Congress to propose an amendment to the Constitution, what portion of each house must approve it?
"3. Each state now has two members in the United States Senate. Before a Constitutional amendment could change this plan of equal representation for any state, what would have to happen?
"4. How is a National Constitutional Convention called?"

v. State of Mississippi, 339 F.2d 679, and more recently, in United States v. Ward, 345 F.2d 857, May 25, 1965, has taken the position that Registrars of the several counties there involved, were required to permit the registration of Negro applicants according to certain standards which this Court determined, on the records before it, the local Registrars had applied to white registrants. The trial court here should have required the same of its Referee. Its failure to do so is clearly erroneous and requires a reversal of its order approving the action and report of the Referee.

It next becomes necessary for us to ascertain, by an inspection of the record, the extent to which final relief can be given to the applicants who have now persisted for a period of three years, both as witnesses and repeated applicants, in their effort to obtain what the Constitution promised them in the first place.

■ We have carefully examined each record. We find that a substantial number of those rejected by the Referee have now been registered by the County Board and there now remain but 36 of the 82 whose records the United States contended before the District Court warranted their being certified as qualified. We test these on the written record before us against the qualifications required by the District Court in its order. We do this because, although the District Court's requirement as to demonstrating an ability to read or write by answering the questions on the application form and questionnaire is perhaps more than was sometimes required of the white appli· cants during the period of discrimination, the Government does not now contest the propriety of this requirement.

In examining each applicant's record, we apply the test stated by the trial court in its injunctive order which is binding on the State registrars dealing with literacy. This requirement is, as stated above, that the applicant "is able to demonstrate his ability to read *or* write by answering the questions of the application form and questionnaire."

(Emphasis added.) The Government, in its brief, divided the 36 applicants into three categories: (1) consisting of seven it considered had demonstrated literacy beyond serious dispute; (2) consisting of 18 applicants characterized as having handwriting and spelling somewhat faulty but who clearly demonstrated their literacy to the Referee; (3) consisting of 11, classified by the Government as borderline cases, which, however, it contends met the requirements established for the state registrars.

■ We concur fully as to those named in the first two categories, and we have no doubt about any except four of the 11 in the borderline category. Then, looking at the four that appear to be the least expert at writing, we find that their ability to read and understand the questions on the application form and questionnaire, the only requirement made by the trial court, is testified to by the Referee himself, because on each of the application blanks, the Referee is required to state whether "this applicant was able to fill out this application form himself." Not only did the Referee sign as to the ability of each of these four applicants to fill out the form himself, but the answers to the questions on the application form and the questionnaire in every case show an intelligent understanding of the questions. It is true that not much writing was required in filling in the application form or in answering the questions on the questionnaire. Nevertheless, this was the test devised by the trial court, and we consider it a proper test in that it demonstrated that the registrant was able to read reasonably involved inquiries and make an intelligent answer to them, even though the answers were such things as dates and the single word "yes" or "no" in some instances.

It was only where the applicant sought to take down from oral dictation by the referee the complicated Article of the United States Constitution providing for the amendment to the Constitution that these four applicants ran into difficulties. These difficulties were real.

Their efforts at writing down the language of this article were uniformly unsuccessful, as were their attempted answers to the four succeeding questions which they were expected to make based upon their transcription of Article V.

Appellant calls our attention to an order entered by the District Court on March 16, 1965, in which the Court made plain what it had theretofore ordered in the preliminary injunction. While this Court would not normally look to any orders entered by the trial court subsequent to that on appeal in the principal case against the voting registrars, we do so here for a limited purpose. Here it is of significance to enable us to ascertain whether the trial court's own officer, the Referee, is complying with the court's direction to the county registrars. We deem this appropriate in order to determine whether we should send these applicants back for a further appearance before the Referee. We conclude that what the Court said in its order of March 16, on this very point, makes it abundantly clear that there is no justification in causing these four applicants to wait any longer to become entitled to their certificates as registered voters. The Court, in that order said:

> "In judging literacy, the Board is ordered not to reject for poor handwriting or misspelling if the answers to the questions demonstrate the applicants' ability to read and understand the questions."

Thus, it is made plain again that the Court intends to require that the County registrars qualify any person who "demonstrates [his] ability to read and understand the questions," without any requirement of his ability also to write legibly or correctly. For us to apply any higher standard as to these four applicants would be to put a penalty on those who have suffered the greatest inconvenience and loss of time in vindicating what now are clearly their rights.

The order of the trial court affirming the actions of the Referee is hereby reversed and the case is remanded for further proceedings not inconsistent with this opinion, and specifically for the purpose of entering appropriate findings and taking such further action as may be necessary to certify for qualification as registered voters the following persons listed numerically by the numbers assigned them by the Referee:

| | Name | Report No. |
|---|---|---|
| 1. | Ed Deyampert | 2881–13 |
| 2. | Sallie F. Norfleet | 2881–18 |
| 3. | Corine Sanders | 2881–20 |
| 4. | Lula M. Fowlkes | 2881–24 |
| 5. | Ethel Norfleet | 2881–25 |
| 6. | Eugene Jackson | 2881–41 |
| 7. | Luke Jackson | 2881–54 |
| 8. | Elsie Core | 2881–55 |
| 9. | Bertha Nelson | 2881–58 |
| 10. | Emerson Lee | 2881–84 |
| 11. | John C. Lewis | 2881–86 |
| 12. | Mattie J. Huff | 2881–88 |
| 13. | Thelma Lewis | 2881–89 |
| 14. | Zayda Gibbs | 2881–90 |
| 15. | Robert King | 2881–92 |
| 16. | Annie L. Young | 2881–99 |
| 17. | Sadie Pryor | 2881–100 |
| 18. | Laura Barron | 2881–116 |
| 19. | James H. Howard | 2881–127 |
| 20. | Della Tubbs | 2881–129 |
| 21. | Jessie Royal Williams | 2881–153 |
| 22. | Fannie Coleman | 2881–155 |
| 23. | Jim Banks | 2881–181 |
| 24. | Jettie Melton | 2881–184 |
| 25. | Jeaneen C. Dobyne | 2881–188 |
| 26. | Veria B. Heard | 2881–199 |
| 27. | Corene Heard | 2881–206 |
| 28. | Reese White | 2881–218 |
| 29. | Humphrey Sims | 2881–219 |
| 30. | Lovey F. Sims | 2881–220 |
| 31. | Edmond Wood | 2881–233 |
| 32. | Margaret Kinard | 2881–235 |
| 33. | Emma Peterson | 2881–241 |
| 34. | Mary Childs | 2881–251 |
| 35. | Pearlie Mae Johnson | 2881–263 |
| 36. | Rosa Bell Hall | 2881–265 |