UNITED STATES of America, Appellant,

v.

Katherine WARD (Louisiana), Registrar of Voters of Madison Parish, Louisiana, and the State of Louisiana, Appellees.

No. 21235.

United States Court of Appeals Fifth Circuit.

Aug. 11, 1965.

Harold H. Greene, Gerald P. Choppin, Alan G. Marer, Attys., Dept of Justice, Burke Marshall, Asst. Atty. Gen., Edward Shaheen, U. S. Atty., John Doar, Atty., Dept. of Justice, Washington, D. C., for appellant.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Harry Fuller, Carroll Buck, Harry J. Kron, Jr., Asst. Attys. Gen. of Louisiana, Baton Rouge, La., Thompson L. Clarke, St. Joseph, La., James E. Phillips, Jr., Sp. Counsel, Baton Rouge, La., for appellees.

Before MARIS,* RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question in the Government's appeal in this § 1971(c), 42 U.S. C.A. § 1971(c), voter registration suit is whether, having found flagrant racial discrimination pursuant to a pattern or practice, the District Court should have applied the freezing principle to permit Negro applicants to be tested by the standards formerly applied to whites, rather than current higher standards applied to all. Answering in the affirmative, we modify and reverse.

For our purposes the Louisiana requirements for registration and voting may be briefly sketched. Under the Constitution of Louisiana, registration, which is a prerequisite to voting in any election, La.Const. Art. 8, § 1(b), is conducted in each parish by a registrar

* Of the Third Circuit, sitting by designation.

of voters, who is appointed by the police jury or other governing body of the parish. La.Const. Art. 8, § 18; L.S.A.–R.S. 18:1. Permanent registration is mandatory for parishes containing a municipal corporation of more than 100,000 population and optional for other parishes. L.S.A.–R.S. 18:231, 249.[1]

The qualifications which must be possessed by each person desiring to register are set forth in Title 18, §§ 31 and 35 of the Louisiana Revised Statutes. Section 31 provides that the applicant must be a citizen of the United States, twenty-one years of age, a resident in the State for one year, in the parish six months, and in the precinct three months, "of good character" and must understand "the duties and obligations of citizenship under a republican form of government", and "be able to read and write." As to the latter, he must "demonstrate his ability to do so * * by making, under oath administered by the registrar or his deputy, written application thereof in the English language or in his mother tongue." This application must "contain the essential facts necessary to show that he is entitled to register," and must be "entirely written, dated and signed by him, except that he may date, fill out and sign the blank application for registration in the presence of the registrar or his deputy, without assistance or suggestions from any person or any memorandum whatever, other than the form of the application itself."[2] Section 35 requires that applicants "also be able to read any clause in the Constitution of Louisiana or of the United States and give a reasonable interpretation thereof."[3]

Finally, an applicant (and voter) must be able to establish "in all cases" that he is the "identical person whom he represents himself to be." La.Const. Art. 8, § 1(e).

On top of these statutory qualifications for registration are the qualifications for voting contained in the Louisiana Constitution (Art. 8, § 1). In order to be a qualified voter, one must be registered. In addition, the individual must demonstrate ability to read and write, not only by filling out an application form, but also by reading and writing from dictation given by the registrar, any portion of the preamble to the United States Constitution (Art. 8, § 1(c) (7)). In addition, he must be "attached to the principles of the Constitution of the United States and of the State of Louisiana," and "well disposed to the good order and happiness of the State of Louisiana" by executing an affidavit that "he will faithfully and fully abide by all of the laws of the State * * *" Art. 8, § (1) (d). And in August 1962, the new multiple-choice "citizenship" test was inaugurated (see note 6, *infra*).

The suit was filed in October 1961 against the State of Louisiana and Registrar Ward, Registrar Madison Parish. Tried in December 1962, it was decided on October 22, 1963.

As the appeal is based on the trial Court's findings, with neither party attacking them, we may severely capsulate the facts by repeating or paraphrasing the Judge's language.

---

1. At the time of the trial, Madison Parish had periodic re-registration every four years, but on February 14, 1963, changed to a system of permanent registration.

2. Special provisions govern persons who are unable to write. Also under L.S.A.–R.S. 18:36, illiterates may be registered. Although this statute remains on the books, a 1960 amendment to the Louisiana Constitution omitted the constitutional basis for the registration of illiterates, and thus apparently contemplates that illiterates no longer can be registered. Compare La.Const. Art. 8, § 1(d)

(Supp.) with Art. 8, § 1(d) prior to the 1960 amendment.

It is further provided that the inability of any person registered as of November 8, 1960, to read or write for any reason, shall not be grounds for removal from the registration rolls, and in Madison Parish illiterates registered prior to January 1, 1961, do not have to re-register.

3. The interpretation test was declared unconstitutional in United States v. State of Louisiana, E.D.La., 1963, 225 F.Supp. 353, and this was affirmed, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709.

Registrar Ward has been registrar of voters in Madison Parish since January 1955, having succeeded to the office previously held by her mother, Mrs. Mary K. Ward, who had been registrar for 31 years. As of the time of the trial, registration in Madison Parish was periodic so that every four years a complete re-registration was held. The present period began January 1, 1961. Since that time, registration is now permanent.[4] No Negro had been registered in Madison Parish during this century prior to the trial of this case. Even though in 1960 there were 3,334 white persons and 5,181 Negroes of voting age in Madison Parish, no Negroes were registered as of the end of the last registration period (December 31, 1960) or August 1, 1962, although between then and February 1963 a few had succeeded.[5]

Under Louisiana law, applicants for registration to vote are required to establish their identities to the satisfaction of the registrar. Registrar Ward and her mother, Mrs. Mary K. Ward, prior to the trial of this case used the identification requirement to discriminate against Negroes in the following ways. On many occasions when Negroes tried to register from 1947 through 1954, they were told that they would have to have two registered voters to identify them before they could be registered. Negroes were not asked for other reasonable identification nor was it accepted when offered. White persons who were registered were not required to produce identification. Several Negroes who attempted to register

were referred to the Sheriff of Madison Parish, C. E. Hester. Sheriff Hester on one occasion in 1954 told Negroes that he was tired of their trying to register to vote and that no Negro was going to register so long as he was sheriff. No Negro tried to register to vote again until August 1961. Since the time Registrar Ward took office in January 1955, she has not required identification from applicants who had been previously registered in the parish. Since she knows most of the white people in the parish and very few of the Negroes, this policy alone inevitably operated to discriminate against Negroes. Inasmuch as no Negroes previously had been registered, that policy also inevitably discriminated against Negroes. On August 28, 1961, four Negroes appeared at the office of Registrar Ward for the purpose of registering to vote. She would not permit them to make applications for registration but told them instead that they would need two electors to identify them. She did not ask the Negroes for any other form of identification nor would she have accepted any from them. She did not expect that any white persons would identify these Negroes. The Negroes tried unsuccessfully to persuade the Mayor of Tullulah to identify them or to help them find someone who would. They were thus deprived of the opportunity to apply for registration.

In September 1962, Registrar Ward put into effect the new "citizenship" test[6] adopted by the State Board of

---

4. On February 14, 1963, the police jury of the Parish changed the registration to permanent registration.

5.

| | White | Negro |
|---|---|---|
| (a) 1960 Voting Age Population | 3,334 | 5,181 |
| Registered: | | |
| (b) December 31, 1960 | 2,713 | —0— |
| (c) August 1, 1962 | 1,760 | —0— |
| (d) February 28, 1963 | 1,918 | 174 |

---

6. By resolution of August 3, 1962, in compliance with the 1962 amendment to L. S.A.-R.S. 18:191, the State Board of Registration adopted a new "objective test of an applicant's duties and obligations of citizenship under a republican form of government." A constitutional amendment to similar effect, adopted subse-

Registration in the previous month. In addition, since September 1962, applicants are required to read and write from dictation a portion of the preamble to the Constitution of the United States.

Prior to September 1962, the requirements for registration imposed by Registrar Ward permitted applicants to become registered if they were citizens not less than 21 years of age, if they possessed the necessary residence requirements, and if they had not been convicted of a crime. Applicants were not tested for their literacy, knowledge, intelligence or understanding, and the application form was used as a means to obtain and record essential information regarding the substantive qualifications of applicants.

At about the time that the new requirements were put into effect (September 1962), Registrar Ward abandoned the strict identification practice which had prevented Negro applicants from making application for registration. The acts and practices of Registrar Ward in using the identification requirement to discriminate against Negroes had deprived Negroes of their right to vote without distinction of race or color.

On the basis of those facts, the Court concluded that unless restrained by order of the court Registrar Ward would continue to engage in racially discriminatory acts and practices, despite her testimony to the contrary. It also concluded as a mattter of law that the State was properly joined as a party defendant and that the acts and practices of the registrar and her predecessor in office, which violated 42 U.S.C.A. § 1971(a), were also the acts and practices of the State. It held that the registrar must accept from Negro applicants any reasonable identification, and that the registrar could not constitutionally use the identification re-

quirement in any manner which would impose a heavier burden upon Negro applicants than upon white applicants.

The decree entered by the District Court did four principal things. First, although not using the exact phraseology of 42 U.S.C.A. § 1971(a), it found a discriminatory pattern and practice. Second, it enjoined the defendants from refusing to accept from Negro applicants for registration reasonable proof of their identity. Third, it enjoined them from applying different and more stringent registration qualifications, requirements, procedures and standards to Negro applicants for registration than those which *are* applied to white applicants in determining whether or not such applicants are qualified to register to vote. Fourth, it ordered Registrar Ward to submit in writing to the Clerk of the Court and to the United States, each month, a report as to her progress in receiving and processing applications for registration during the preceding calendar month. Finally, the costs of the case were taxed against Registrar Ward, in her official capacity as Registrar (but not against the State).

In its immediate effect, this meant that Registrar Ward could use the "citizenship" test and require applicants to demonstrate literacy by writing from dictation, not copying, although white applicants had not been subjected to such tests.

The Government, satisfied as to the finding of discrimination and the injunctive orders forbidding racial discrimination in the future, attacks the order because the requirement of equal treatment relates to *current* standards of registration—"qualifications, requirements, procedures and standards * * * which *are* applied to white applicants"—thus subjecting Negro (and white) appli-

---

quently on November 6, 1962, requires that the Board "prepare, adopt and issue a uniform, objective written test or examination for citizenship * * * under a Republican form of government." La.Const. Art. 8, § 18 (1963 Supp.).

To take the test an applicant draws one of ten cards. Each card has six multiple

choice questions, four of which the applicant must answer correctly. This test "requires a comprehension of the theory of the American system of government and a knowledge of specific constitutional provisions." United States v. State of Louisiana, E.D.La., 1963, 225 F.Supp. 353, 392.

cants to standards higher than those which at least 1,760 permanently registered white voters [7] were required to meet. In short, it complains that the trial Court ought to have entered a freeze order of the type sought in its proposed decree.[8]

Deprived as we are of the valuable benefit, Myles v. Quinn Menhadden Fisheries, Inc., 5 Cir., 1962, 302 F.2d 146, 1962 AMC 1626; F.R.Civ.P. 52(a), of the view of the District Judge on this score, our task is more difficult in speculating why he declined to grant this relief. Certainly it was not out of any reluctance to brand as palpable, crude, deliberate, and constitutionally shameful the rank discriminatory practice of this Registrar's office. Nor was it from any naive trust in the testimonial protestations that the powerful sanction of a Federal Court injunction was not needed since official conduct in the future would be different. Cf. United States v. Edwards, 5 Cir., 1964, 333 F.2d 575, 581, n. 1 & 2 (dissenting opinion); United States v. Atkins, 5 Cir., 1963, 323 F.2d 733, 739. Rather, in arriving at his decision of October 22, 1963, we think that this conscientious Judge, Kennedy v. Lynd, 5 Cir., 1962, 306 F.2d 222, 230, far from falling into error may have been pulled into it under the constraint of our then recent opinion in United States v. Atkins, 5 Cir., October 3, 1963, 323 F.2d 733, which perhaps led him to conclude that only under most extraordinary circumstances should a freeze order be employed. The State of Louisiana as an appellee and its Attorney General on behalf of the State and Registrar Ward assert with vigor that this still represents the controlling principle. And to this they add also United States v. Ramsey, 5 Cir., Feb. 20, 1964, 331 F.2d 824, which, as originally announced, followed close on the heels of the decision below.

Of course, little was left of Ramsey after rehearing, April 23, 1963, 331 F.2d 838, and whatever remained has long since lost any vitality in view of our subsequent cases which establish, end on end, that where on a final hearing the facts compel the conclusion that racial discrimination has followed a pattern or practice, it is mandatory, not discretionary, for the District Court to make the critical finding under 42 U.S.C.A. § 1971(e). United States v. Lynd,[9] 1965, 349 F.2d 785 (Part II) [June 16, 1965]; United States v. Ward (Mississippi), 5 Cir., 1965, 345 F.2d 857 [May 25, 1965]; United States v. State of Mississippi (Walthall County), 5 Cir., 1964, 339 F.2d 679, 683; United States v. Mayton, 5 Cir., 1964, 335 F.2d 153, 158–159. With Ramsey no longer pertinent, we emphasize that the machine set in train by the § 1971(e) pattern or practice finding is too vital in the execution of this broadly conceived congressional scheme to be left to the choice of the Judge as he looks at the particular case.[10]

---

7. As of August 1, 1962. See note 5, supra.

8. The proposed decree incorporates as the standard that applied as to whites between January 1961 and August 31, 1962. But the freeze was not otherwise limited in point of future time or the status of individual Negro applicants. On brief the Government suggests a dual limitation: (a) to those who were age and residence-eligible during the period of discrimination, and (b) for one year and thereafter until the Court finds the pattern or practice has ceased.

For reasons later discussed, we think these limitations inappropriate.

9. Unless otherwise specifically indicated, reference to Lynd is to this decision (accompanied by the parallel contempt case, United States v. Lynd, 5 Cir., 1965 [June 16, 1965]), and not the earlier cases which are, of course, of incandescent value as they lighted the path hewn by this Court in this critical area. United States v. Lynd, 5 Cir., 1962, 301 F.2d 818; 1963, 321 F.2d 26, cert. denied, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125.

10. Equally important is the desirability of the finding being stated in express and positive terms. Of course, as in United States v. Mayton, 5 Cir., 1964, 335 F.2d 153, it is plain that Judge Dawkins' finding "specifically that the defendants have engaged in acts and practices which have deprived Negro citizens in Madison Parish, Louisiana, of the right secured by 42

So far as Atkins is concerned, it is no stumbling block, no broad declaration that a freeze order should not be used. Indeed, Atkins was an early pronouncement by this Court that "[w]e do not dispute the power of the federal courts to invoke the freezing principle to give relief when necessary." [11] 323 F.2d 733, 744. Both the power and the duty to afford such relief has now been made clear by State of Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d at 715.

 Like decisions in other fields, this was but new material out of which, with much coming later, and in the best Anglo-American juridical tradition, we synthesize principles and sanctions which experience demonstrates are needed. This experience has been rich, abundant in volume, and instructive. From it we have learned that it is unrealistic to suppose that the evils of decades of flagrant racial discrimination can be overcome by purging registration rolls of white voters.[12] From it we have also learned that unless there is some appropriate way to equalize the present with the past, the injunctive prohibitions even in the most stringent, emphatic, mandatory terms forbidding discrimination in the future, continues for many years a structure committing effective political power to the already registered whites while excluding Negroes from this vital activity of citizenship. It does this even, perhaps, at the calculated risk of a high casualty rate among white contemporary applicants tested by the new more rigorous standards. This experience has taught us also that if the constitutional ideal of voter rights free of racial distinctions—now over a century old—is to be effectually achieved, the relief required becomes successively more exacting as successive cases come to us. This evolution is seen in Duke [United States v. Duke, 5 Cir., 332 F.2d 759] followed by Walthall County with the terms and requirements becoming more and more stringent in Ward (Mississippi) and culminating, as of this date in Lynd with its even more severe requirements including a minimum time limitation of two years.

 As in Lynd, we think this case imperatively demands a freeze order. Likewise, as in that case, we think that the one-year limitation indicated first in Duke and prescribed in Walthall County is not adequate. It is true (see note 8, supra) that such one-year period is a conditional one which does not terminate until the Court finds the pattern or practice has ceased. But experience demonstrates that this does not meet the demands imposed by law since the "court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory ef-

U.S.C.A. § 1971(a)" has all of the consequences of one spelled out in the language of § 1971(e). But neither the parties nor, more important, prospective voter applicants, should be left in doubt. Good administration requires that District Judges making the finding do so in the terminology of the statute to assure expedition of post-finding voter applications seeking court registration or, where established, through a court-appointed voting referee.

11. We stated: "It has been used before in voting cases. [Citing] United States v. Dogan, 5 Cir. 1963, 314 F.2d 767. [and] * * * [s]everal school segregation cases have also used the principle. See, e.g., Ross v. Dyer, 5 Cir., 1962, 312 F.2d 191 * * *." 323 F.2d 733, 744.

12. Some of the reasons are set forth and well analyzed in Judge Wisdom's monumental opinion filed November 27, 1963, nearly two months after Atkins, for the 3-Judge Court in United States v. State of Louisiana, E.D.La., 225 F.Supp. 353, 396–397, affirmed on all points, Louisiana v. United States, March 8, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709. And see United States v. Ward (Mississippi), 5 Cir., 1965, 345 F.2d 857, Part III [May 25, 1965]. To these may be added the startling fact that purging of the whites does not correct the Federal wrong— racial discrimination—but merely rectifies violations of State law. And, as discussed, later, reliance on purging of whites creates a conflict between what the Court's order requires of the Registrar and that which the Court (or the court-appointed voter referee) must accord to a rejected applicant in the post-pattern or practice finding machinery of § 1971 (e).

fects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. at 154, 85 S.Ct. at 822, 13 L.Ed. at 715.

■ First, there is the matter of sheer numbers. On this record over 5,000 Negroes of voting age remain unregistered. (See note 5, item (a) supra) To this workload must be added some 1500 whites yet unregistered (item (a) less (d)). During the Ward régime only a handful of Negroes has attained this precious right, and then only under the imminent sanctions of Federal legislation and court decrees. There is something incongruous about the State now urging that these plain, clear rights having been denied for forty years—so much so that from 1954 down to August 1961, not a single Negro undertook to challenge Sheriff Hester's fiat—Negro citizens must now apply within a relatively short space of one year to claim what the Constitution has accorded them for a century. Second, the conditional time limitation will call for further court action. We think that at this late stage, the place for action is not the Federal courthouse, but the State Registrar's office. Third, a court inquiry into whether or not the "pattern or practice has ceased" misses the mark. The freeze order is accorded, not as an additional sanction to the Court voter registration machinery set in motion by § 1971(e), but rather as an effective equitable tool to eradicate the consequences of *past* discrimination. Thus, for example, so long as the 1,760 white voters retain their preferential permanent registration (see item (c), note 5, supra), Negroes suffer the consequences of *past* discrimination even though the pattern or practice ceases as to all contemporary applicants, so that Negro and white alike are being treated fairly and uniformly. Thus, as in Lynd, we conclude that a minimum of two years is called for.

■ We also conclude that under the circumstances of this case, it is inequitable to confine the class of those entitled to the benefit of the freeze to those Negroes who were age and residence-eligible during the discriminatory period ending August 31, 1962. Such a limitation was suggested by the Government and adopted by us in Duke. It does not appear to have been a restriction on the freeze requirements in Walthall County.[13] And it is perfectly clear that in the carefully worked out mandatory order in Ward (Mississippi) and even more recently in Lynd, the freeze is extended to applicants who are *presently* age and residence eligible. Moreover, unless the benefit of the prior-lower-white standard is extended to Negro applicants who are currently eligible, the effects of discrimination by reason of race will still remain. For the fact is, that with the 1,760 *permanently* registered whites (item (c), note 5, supra), none of whom have been required to pass the currently more rigid tests,[14] there are white voters who have been treated differently from Negroes now applying. Considering that the whites thereby permanently registered received this preference during the operation of the unconstitutional pattern or practice, this discrimination offends both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment.[15]

13. The suggested decree required that Mississippi and the voter Registrars "should be enjoined from determining the qualifications of Negro citizens in Walthall County in any manner or by any procedure different from and more stringent than the following which have heretofore been used * * *." Further on, the decree was to require "that in conducting registration * * * the defendant must not use any qualifications as a prerequisite to registration other than the following which we conclude have

heretofore been used by [the registrar] * * *: 1. He *is* a citizen and *is* or *will* be 21 years of age or older at the time of the next election; 2. He has resided in the state two years * * *." United States v. State of Mississippi (Walthall County), 5 Cir., 1964, 339 F. 2d 679, 685.

14. See, e. g., note 6, supra.

15. See Lassiter v. Northampton County Bd. of Elections, 1959, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072. The Supreme

In addition, restricting the benefit of the freeze order to those who prior to September 1, 1962, were age-and-residence eligible brings about an incongruous conflict between what is required of the Registrar and the relief which must be accorded by the Court (or a court-appointed referee) under the 1971(e) machinery. Thus, with the pattern or practice finding, the Court is required to consider and process, United States v. Mayton, 5 Cir., 1964, 335 F.2d 153, the application of any person asserting that "(1) he is qualified under State law to vote," and that "(2) he has since [the pattern or practice] finding * * been (a) deprived of or denied under the color of law the opportunity to register to vote, or (b) found not qualified to vote by any person acting under color of law." § 1971(e). Such applicant need not prove that he was rejected because of race. He need only establish that he was denied registration, and that he "(1) * * * is qualified under State law to vote." This is crucial, for the Court, or court-appointed referee, in determining whether he "is qualified under State law" is confined by the Civil Rights Act to standards no more stringent than applied to white applicants during the pattern or practice period.[16] Unless the freeze order extends to all Negro applicants, one rejected by the Registrar even by good faith impartial grading under more rigid current standards would be entitled under § 1971(e) to apply for Federal Court registration. With rejection established, the standard to be employed by the Court would be, not the newer, more rigid requirements applied by the Registrar, but the more lax standards formerly applied to whites during the pattern or practice period. It is an understatement to say that Congress, counting fully on the judicial inventiveness and the full resourcefulness of equity to mold effective sanctions under § 1971(c), United States v. Alabama, 5 Cir., 1962, 304 F.2d 583, 591, hardly contemplated that two standards were required, or even permitted. That would have again reversed the tables to throw more, not less, registration in the Federal Courts. The aim of the voter rights provisions of the 1957, 1960, and 1964 Civil Rights Acts is to compel performance of State voter laws by State officials in accordance with constitutional demands. The action must, to be sure, be taken constitutionally. But it ought to be taken in the Registrar's office. Resort to the Federal Court should at this late date be rare. Cf. United States v. Scarborough, 5 Cir., 1965, 348 F.2d 174 and 348 F.2d 168. [June 30, 1965].

The effect of the freeze order required by us is to forbid post Septem-

Court upheld a North Carolina literacy requirement which was part of a provision in the North Carolina Constitution containing a grandfather clause. It was agreed that the grandfather clause was invalid, but the North Carolina Supreme Court had ruled that the literacy test was separable. The appellant, a Negro citizen of North Carolina, urged that this did not end the problem presented by the grandfather clause because there was a provision for permanent registration in some counties and that, although the cut-off date for registration in the grandfather clause was December 1, 1908, those who registered before then might still be voting. The Court said:

"If they were allowed to vote without taking a literacy test and if appellant were denied the right to vote unless she passed it, members of the white race would receive preferential privileges of the ballot contrary to the command of the Fifteenth Amendment. That would be analogous to the problem posed in the classic case of Yick Wo v. Hopkins, 118 U.S. 356, [6 S.Ct. 1064, 30 L.Ed. 220], where an ordinance unimpeachable on its face was applied in such a way as to violate the guarantee of equal protection contained in the Fourteenth Amendment." 360 U.S. at 50, 79 S.Ct. at 989.

16. "Qualified under State law" is defined to mean
"* * * qualified according to the laws, customs, or usages of the State, and shall not, in any event, imply qualifications more stringent than those used by the persons found in the proceeding to have violated subsection (a) of this section in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist." § 1971(e).

ber 1962 requirements. These include use of the new citizenship test (footnote 6, supra), the requirement that the applicant read and write *from dictation* a portion of the Constitution, and the requirement that the application form be entirely written by the applicant without any assistance or supervision.[17]

■■■■■ Ordinarily we would merely reverse the decree with directions to the District Court to enter a suitable decree following the Ward-Lynd format with a minimum two-year period and benefit of the freeze extended to all Negro applicants based on current age-residence eligibility. We think, however, that good administration suggests that the proposed decree be indicated by an Appendix, not because of any apprehension that the conscientious District Judge would not faithfully impose every condition so obviously implied, but rather because of factors bearing upon administration itself. It is not possible, or even desirable, of course to achieve absolute uniformity. But in this ever growing class of cases which have their genesis in unconstitutional lack of uniformity as between races, courts within this single circuit should achieve a relative uniformity without further delay. We have come to this in school discrimination cases. See, e. g., Lockett v. Board of Educ. of Muscogee Cty., Ga., 5 Cir., 1965, 342 F.2d 225; Singleton v. Jackson Municipal Separate School Distr., 5 Cir., 1965, 348 F.2d 729. [June 22, 1965]; Price v. Denison Ind. School Dist. Bd. of Educ., 5 Cir., 1965, 348 F.2d 1010 [July 2, 1965]. Voter registrars should come to learn that when the cases are tried on the application for permanent injunction and the facts establish a pattern or practice, the District Court must so find. Next, the Judge must make the finding to set in operation the § 1971(e) machinery. Next, he must enter a decree which, through suitable freeze provisions, effective for an ade-

quate period of time, will assure that the evils of past discrimination be eradicated before new and more stringent state provisions may be exacted of Negro applicants. The handwriting is indeed on the wall—in Mississippi Ward, in Lynd, and now Louisiana Ward.

■■■■ This leaves only the tag end of the Government's complaint that the District Court erred in not taxing costs against the State. As in Lynd (Part IV), not a single possible whisper of a suggestion is offered in this record to support any discretion in not assessing costs against the State. With no criticism whatever implied for having done so, the simple fact is that in this case, as in other voter registration cases so far carried on in Louisiana, the right arm of that State on behalf of the State and individual Registrars has been its Attorney General. Here he is aided by the local District Attorney. The battle is not that of Mrs. Ward. The battle is between the two sovereigns. United States v. State of Mississippi, 1964, 229 F.Supp. 925, 974 (dissenting opinion), reversed, 1965, 380 U.S. 128, 85 S.Ct. 808, 13 L. Ed.2d 717. Aid, comfort, financial, and perhaps moral came to her from the State. As an unsuccessful litigant, there is no reason here why the State should not bear the usual consequences of such a venture.

Reversed and remanded.

## APPENDIX

### FINAL DECREE

I. This court finds that the defendants have engaged in acts and practices which have deprived Negro citizens of Madison Parish, Louisiana, of their rights, secured by 42 U.S.C.A. § 1971(a), to register to vote without distinction by reason of race, and that such deprivation has been pursuant to a pattern or practice of discrimination against Negro citi-

---

17. Because of the action taken by us, we need not determine, as suggested by the Government's supplemental brief, the extent to which the 1964 Civil Rights Act, 78 Stat. 241, P.L. 88–352, July 2, 1964, is applicable in prohibiting the oral dictation test (§ 101(a) (2) (C)), denying assistance now required (§ 101(a) (2) (A)), or possibly the use of the new citizenship test.

zens in the registration processes in Madison Parish, Louisiana.

II. It is ordered, adjudged, and decreed by the Court that the Defendant State of Louisiana and the Defendant Katherine Ward, Registrar of voters of Madison Parish, Louisiana, their agents, officers, employees and successors in office be and each is hereby permanently enjoined from

1. Engaging in any act or practice which involves or results in distinctions based on race or color between Negro citizens and other citizens in the registration for voting process in Madison Parish, Louisiana.

2. Determining the qualifications of citizens in Madison Parish, Louisiana, in any manner or by any procedure different from or more stringent than the following which have heretofore been used from January 1, 1961, to August 31, 1962, by registrars of Madison Parish and their agents in determining the qualifications of white applicants:

(a) He is a citizen and is 21 years of age or older.

(b) He has resided in the State, Parish, and Precinct the required periods;

(c) He is not disqualified by reason of conviction of a disqualifying crime;

(d) He is able to demonstrate a reasonable ability to read and write by reading and copying a portion of the Preamble to the Constitution of the United States. In judging literacy, the registrar is further ordered not to take into account bad handwriting and spelling so long as it is reasonably legible.

(e) No applicant shall be rejected for an error or omission in his application which is not material in determining whether the applicant meets the substantive requirements set out in paragraph 2(a), (b), (c), and (d); nor shall any applicant be rejected for any other error or omission relating to his substantive qualifications as set forth in paragraph 2(a), (b), (c), and (d) in his application unless such error or omission has been specifically pointed out and explained to him by the registrar or his agent and the applicant refuses to supply the requested information.

3. The provisions of paragraph 2 shall remain in full force and effect until such time as: (a) The proper local officials of Madison Parish, Louisiana, order an entirely new registration of all voters in Madison Parish. No such registration shall take place, however, until the officials conducting the registration shall notify all of the parties to this suit of the requirements, standards, and procedures to be used for such reregistration by the filing of a petition or motion, and until a hearing can be held by this Court and findings made that the requirements, standards and procedures to be used insure that such reregistration will comply fully with the Constitution and laws of the United States and the valid constitutional provisions and laws of the State of Louisiana and that no discrimination by reason of race or color will be made in the administration of the registration procedures in said new registration. In the event of such a new registration, each applicant shall be subjected to the same procedures and be required to meet the same standards as every other applicant without regard to whether or when he had been previously registered to vote; or (b) until it has been shown to the satisfaction of this Court that the effects of the pattern or practice of discrimination against Negroes seeking to register to vote in Madison Parish have been overcome, and provided further, no such showing may be made to this Court prior to two years from the entry of this Judgment. Any modification of the requirements of this paragraph 2 shall be consistent with the provisions of Section 101(a) of the Civil Rights Act of 1964, and any amendment thereto.

4. It is further ordered that Defendant Katherine Ward, her agents, employees, and successors, in conducting

registration of voters in Madison Parish, Louisiana, are enjoined and ordered to:

(a) Afford each applicant for registration an opportunity to apply and complete the application form whether either the registrar or a deputy registrar is present;

(b) Accept from Negro applicants for registration reasonable proof of their identity, such as:

(1) Authentic licenses or permits issued by any governmental agency or authority, such as driving, hunting, or fishing licenses, library cards, or automobile registrations;

(2) Authentic military identification documents, such as selective service registration cards, discharge papers, or reserve unit identification cards;

(3) Authentic records of the possession of ownership of real property, such as rent receipts, deeds or contracts to purchase or lease, receipts for deposits on utilities, or homestead exemption certificates.

(c) Advise each applicant, when he or she applies, whether the applicant is accepted or rejected; if accepted, the applicant must be registered at that time; if rejected the applicant must be informed of the reason or reasons for his rejection and must be advised of his right to apply directly to this Court to be registered as provided in paragraph 5 hereof.

(d) Receive and process each applicant as expeditiously as possible to the extent that the physical facilities of the registration office permit but in no case less than * * * applicants at one time and in no case refuse to process fewer than * * * applicants at one time. The office of the registrar shall be open during regular business hours for registration from Monday through Friday of each week except on holidays during the twenty-four-month period following the entry of this order.

5. Any applicant for registration hereafter rejected or not given the opportunity to apply by the Defendant Katherine Ward, her agents, employees, or successors, may in accordance with 42 U.S.C.A. § 1971(e) apply to this court, or to a voting referee to be appointed by and in the discretion of this court no more than 20 days after receipt by the court of the first application, to have his qualifications determined. The court or such referee shall register all such applicants who meet the standards established in this order.

6. It is further ordered that the Defendant Katherine Ward, her agents, employees, and successors in office shall file a written report with the clerk of this Court and shall mail a copy thereof to the Plaintiff's attorneys on or before the tenth day of each month. Said reports shall state the dates and places applications were received and the hours during which the Registrars were available to receive applications; and also shall contain the name and race of each applicant for registration from the previous monthly period, the date of the application, the action taken on the application, and if the applicant is rejected, the specific reason or reasons for rejecting the application. The first of such reports shall be submitted on the tenth day of the month following the date of this order.

7. The Defendant Katherine Ward, her deputies, agents, and successors in office shall, until further order of this Court, make the registration records of Madison Parish, Louisiana, available to attorneys or agents of the United States at any and all reasonable times for the purpose of inspection, copying, and photographing.

8. Jurisdiction is retained of this cause for all purposes and especially for the purpose of issuing any and all additional orders as may become necessary or appropriate for the purposes of modifying and/or enforcing this order.

9. Costs in this Court are awarded to Plaintiff and taxed against the Defendants.

......, 196.. .......................

(Date) United States District Judge